**In the interest of J.T.G., H.N.M., M.D.M., B.M.L., Children.**

No. 2–03–039–CV.

Court of Appeals of Texas, Fort Worth.

Oct. 16, 2003.

Cindy Stormer, Gainesville, for Appellant (P.G.).

Christopher M. Fostel, Decatur, for Appellant (S.L.).

C. Ed Davis, TDPRS General Counsel, Phoebe Knauer, Deputy Gen. Counsel, Cathy Morris, Chief Atty. for Field Operations, Sarah R. Guidry, Supervising Atty. for Field Operations, Special Litigation Unit, Duke Hooten, Appellate Atty., Office of Gen. Counsel Special Litigation Unit, Austin, for Appellee.

PANEL F: CAYCE, C.J.; GARDNER and WALKER, JJ.

## OPINION

SUE WALKER, Justice.

### I. Introduction

P.G. appeals the trial court's judgment terminating her parental rights to four of her children. In four points, P.G. complains that the evidence is legally and factually insufficient to support any of the four statutory grounds for termination pleaded by the Texas Department of Protective and Regulatory Services ("TDPRS"). She also contends that the trial court erred by refusing to submit her requested jury instructions and questions and by denying her request for a disinterested expert witness.

S.L. is the father of P.G.'s youngest child, B.M.L. Based on the jury's verdict, the trial court rendered a judgment terminating S.L.'s parental rights to B.M.L. In three points, S.L. contends that the evidence is legally insufficient to support any of the four statutory grounds for termination pleaded by TDPRS. He also contends that the trial court erred by denying him a sufficient number of peremptory challenges and by admitting evidence of his prior bad acts. We will affirm.

### II. Factual and Procedural Background

P.G. is the mother of J.T.G., born in April 1995, H.N.M., born in October 1997, M.D.M., born in July 1999, and B.M.L., born in July 2001 (the "children"). The alleged father of J.T.G. was only briefly involved with P.G. and never had any contact with P.G. or J.T.G. during P.G.'s pregnancy or after J.T.G.'s birth. Eleven months after J.T.G. was born, P.G. became involved with the father of H.N.M. and M.D.M. In 1998, the couple was common-law married. In 1999, P.G. ended her four-year relationship with the father of H.N.M. and M.D.M.[1] and began a relationship with S.L. immediately thereafter. After two weeks, P.G. and S.L. moved in together. As previously mentioned, S.L. is

1. The trial court terminated the parental rights of the alleged father of J.T.G. and the father of H.N.M. and M.D.M. However, neither is a party to this appeal.

the father of B.M.L.[2] and was still living with P.G. at the time of trial. P.G. and S.L. are the parents of another child who was not a subject of this suit.

TDPRS first became involved with P.G. and her children in October 1997 following the birth of H.N.M. TDPRS received a referral after H.N.M. was born with hydrocephalus—a build-up of fluid on the brain and agenesis of the corpus callosum. Concerns existed due to the child's fragile medical condition, her special needs, and allegations of physical abuse stemming from P.G.'s drug use during her pregnancy. P.G. admitted at the time of the investigation and at trial that she used various drugs during her pregnancy with H.N.M. However, TDPRS found no evidence of drug use by P.G. or H.N.M.'s father during the time of the investigation. Both parents were involved in an early childhood intervention program, and H.N.M. was attending all scheduled medical appointments. Following its investigation, TDPRS decided not to remove the children from P.G.'s care.

In July 2001, TDPRS again became involved with P.G. and with S.L. after P.G. attempted to commit suicide by overdosing on prescription and nonprescription drugs. P.G. was approximately thirty-three weeks pregnant with B.M.L., and B.M.L. was born the day after P.G.'s suicide attempt. A drug screen conducted on P.G. revealed positive results for benzodiazepines, amphetamines, and opiates. An investigation by TDPRS revealed that the suicide attempt stemmed from an argument between P.G. and S.L., which resulted in S.L. leaving P.G. for a brief period of time. As a result of P.G.'s suicide attempt, prior drug abuse of both P.G. and S.L., and "high risk" to the children, TDPRS decided to open a case for the provision of in-home safety services focusing on family preservation. TDPRS implemented a safety plan that required S.L. and P.G.'s sister to supervise all contact between P.G. and her children. P.G. was also required to complete a mental health evaluation and receive counseling. Sue McAfee ("McAfee"), a family preservation caseworker with TDPRS, specifically instructed P.G. and S.L. to abstain from any drug or alcohol use. Prior to the completion of a family preservation plan, TDPRS received calls concerning alleged drinking and drug use by P.G. and S.L., as well as an alleged fight between the couple at a relative's home. However, when questioned by McAfee, the couple denied the allegations.

In August 2001, only twelve days after the family preservation case was opened, an incident of family violence occurred between P.G. and S.L. During an altercation regarding B.M.L., P.G. stabbed S.L. in the leg with a knife. At some point during the incident, B.M.L.'s head was bumped on a door frame. All four children were present in the home at the time of the incident. As a result of continued family violence and past drug abuse, all four children were immediately removed from P.G. and S.L.'s care on or about August 6, 2001. In order for P.G. and S.L. to regain custody of their children, TDPRS created a series of four family service plans. As part of their service plans, P.G. and S.L. were to obtain chemical dependency assessments and psychological evaluations, to submit to and test negative in random drug screens, and to attend parenting classes and counseling sessions for anger management, drug addiction, and domestic violence. Both parents complied with the service plans by completing parenting classes and obtaining

**2.** The father of H.N.M. and M.D.M. was the presumed father of B.M.L. due to his common-law marriage with P.G. However, he voluntarily relinquished his rights to B.M.L. Subsequently, S.L. acknowledged his paternity as to B.M.L.

chemical dependency assessments. However, during the first and second service plans, neither P.G. nor S.L. obtained a psychological evaluation or attended counseling sessions for anger management, drug addiction, and domestic violence. Both P.G. and S.L. likewise failed to complete counseling sessions for anger management, drug addiction, and domestic violence as required by the third service plan. Over the course of the four service plans, P.G. tested positive for drug use, and both P.G. and S.L. failed to submit to drug testing on repeated occasions. P.G. and S.L. completed inpatient treatment for drug abuse, yet refused to participate in a required outpatient relapse prevention program. The couple also never obtained stable living arrangements.

Both parents sporadically attended visitation with the four children and typically never called when they were going to miss scheduled visits. P.G. missed nineteen of sixty-one scheduled visits with her children, including eight of the last ten. S.L. missed seventeen of sixty-one scheduled visits with the children, including seven of the last ten. Initially, as a result of P.G. and S.L.'s failure to attend visits, J.T.G. appeared sad and disappointed, and H.N.M. appeared angry and often displayed her anger. Yet over time, both children appeared indifferent when P.G. and S.L. would miss visitation.

On November 27, 2002, TDPRS filed a second amended petition to terminate P.G.'s parental rights to all four children, and S.L.'s parental rights to B.M.L. According to TDPRS, the decision to terminate P.G. and S.L.'s parental rights was based upon noncompliance with TDPRS's service plans, concerns about P.G. and S.L.'s continued drug and alcohol abuse, and TDPRS's belief that P.G. and S.L. were unable to properly care for the children and provide a safe and stable environment for them. On January 24, 2003, after several days of testimony at trial, a jury determined that P.G. and S.L.'s parental rights should be terminated, and the trial court entered a termination order on February 18, 2003. This appeal followed.

### III. BURDEN OF PROOF IN TERMINATION PROCEEDINGS

■■■ A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982); *accord Holick v. Smith*, 685 S.W.2d 18, 20 (Tex.1985). The United States Supreme Court, in discussing the constitutional stature of parental rights, states, "[T]he interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000). Nonetheless, while parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex.2002). Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right. *Id.*

■■■ In proceedings to terminate the parent-child relationship brought under section 161.001 of the Texas Family Code, TDPRS must establish one or more of the acts or omissions enumerated under subsection (1) of the statute and must also prove that termination is in the best interest of the child. TEX. FAM.CODE ANN. § 161.001 (Vernon 2002); *Swate v. Swate*, 72 S.W.3d 763, 766 (Tex.App.-Waco 2002, pet. denied). Both elements must be established; termination may not be based

solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex.1987). Because of the elevated status of parental rights, the quantum of proof required in a termination proceeding is elevated from the preponderance of the evidence to clear and convincing evidence. *Santosky*, 455 U.S. at 746, 102 S.Ct. at 1391; *see also* TEX. FAM.CODE ANN. § 161.001.

■■■ Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM.CODE ANN. § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex.2002); *C.H.*, 89 S.W.3d at 25. This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard in criminal proceedings. *State v. Addington*, 588 S.W.2d 569, 570 (Tex.1979); *In re D.T.*, 34 S.W.3d 625, 630 (Tex.App.-Fort Worth 2001, pet. denied) (op. on reh'g). While the proof must be more than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed. *Addington*, 588 S.W.2d at 570. Termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re A.V.*, 849 S.W.2d 393, 400 (Tex.App.-Fort Worth 1993, no writ).

## IV. P.G.'s APPEAL

### A. Legal and Factual Sufficiency of the Evidence

In her first two points, P.G. contends that the evidence is legally and factually insufficient to support the jury's findings that she (1) knowingly placed or knowingly allowed the children to remain in condi- tions or surroundings that endangered their emotional or physical well-being; (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their emotional and physical well-being; (3) failed to comply with the provisions of a court order that specifically established the actions necessary for the children's return; and (4) used a controlled substance in a manner that endangered the health and safety of the children, and failed to complete a court-ordered substance abuse treatment program, or after completion of a court-ordered substance abuse treatment program, continued to abuse a controlled substance. *See* TEX. FAM.CODE ANN. § 161.001(1)(D), (E), (O), (P).

### 1. STANDARD OF REVIEW

The Texas Supreme Court recently clarified the appellate standards of review to be applied to legal and factual sufficiency of the evidence challenges in light of the clear and convincing evidence burden of proof in termination proceedings. *J.F.C.*, 96 S.W.3d at 264–68 (discussing legal sufficiency review); *C.H.*, 89 S.W.3d at 25 (discussing factual sufficiency review). Because termination findings must be based upon clear and convincing evidence, not simply a preponderance of the evidence, the supreme court has held that the traditional legal and factual standards of review are inadequate. *J.F.C.*, 96 S.W.3d at 265; *C.H.*, 89 S.W.3d at 25. Instead, both legal and factual sufficiency reviews in termination cases must take into consideration whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the matter on which the State bears the burden of proof. *J.F.C.*, 96 S.W.3d at 265–66; *C.H.*, 89 S.W.3d at 25. With respect to a legal sufficiency point, we "look at all the evidence in the light most favorable to the finding to determine whether a reasonable

trier of fact could have formed a firm belief or conviction that its finding was true." *J.F.C.*, 96 S.W.3d at 266. In determining a factual sufficiency point, we must give due consideration to evidence that the fact finder could reasonably have found to be clear and convincing and then determine whether, based on the entire record, a fact finder could reasonably form a firm conviction or belief that the parent violated one of the provisions of section 161.001 and that the termination of his or her parental rights would be in the child's best interest. TEX. FAM.CODE ANN. § 161.001; *C.H.*, 89 S.W.3d at 25.

### 2. Evidence Regarding Endangering Environment and Course of Conduct

■ We first review the evidence supporting the trial court's findings that P.G. knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being and that she engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E).

■ Endangerment means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex.1996). Under subsection (D), it is necessary to examine evidence related to the environment of the children to determine if the environment was the source of endangerment to the children's physical or emotional well-being. *D.T.*, 34 S.W.3d at 632. Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child. *In re W.S.*, 899 S.W.2d 772, 776 (Tex.App.-Fort Worth 1995, no writ). For example, abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the

physical or emotional well-being of a child. *See id.* at 776–77; *Ziegler v. Tarrant County Child Welfare Unit*, 680 S.W.2d 674, 678 (Tex.App.-Fort Worth 1984, writ ref'd n.r.e.). Parental and caregiver illegal drug use and drug-related criminal activity likewise supports the conclusion that the children's surroundings endanger their physical or emotional well-being. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex.App.-San Antonio 1998, pet. denied).

■ Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re R.D.*, 955 S.W.2d 364, 368 (Tex.App.-San Antonio 1997, pet. denied); *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 83–84 (Tex.App.-Dallas 1995, no writ). Additionally, termination under section 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. TEX. FAM.CODE ANN. § 161.001(1)(E); *D.T.*, 34 S.W.3d at 634; *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex.App.-Eastland 1999, no pet.).

■ However, it is not necessary that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533. To determine whether termination is necessary, courts look to parental conduct both before and after the child's birth. *In re D.M.*, 58 S.W.3d 801, 812 (Tex.App.-Fort Worth 2001, no pet.). A mother's use of drugs during pregnancy may amount to conduct that endangers the physical and emotional well-being of the child. *In re K.M.B.*, 91 S.W.3d 18, 25 (Tex.App.-Fort Worth 2002, no pet.). Drug addiction and its effect on a parent's life and ability to parent may establish an endangering course of conduct

as well. *Dupree,* 907 S.W.2d at 84. A parent's attempt to commit suicide may also contribute to a finding that the parent engaged in a course of conduct that endangered a child's physical or emotional well-being. *See In re A.M.C.,* 2 S.W.3d 707, 716 (Tex.App.-Waco 1999, no pet.).

Because the evidence concerning these two statutory grounds for termination is interrelated, we consolidate our examination of it. *S.D.,* 980 S.W.2d at 762; *In re B.R.,* 822 S.W.2d 103, 106 (Tex.App.-Tyler 1991, writ denied) (recognizing the link between a parent's conduct and a child's conditions and surroundings). The record contains the following evidence of subsection (D) environmental endangerment and subsection (E) course of conduct endangerment of the physical or emotional well-being of the children.

The record shows a pattern of continued violence and abuse involving P.G. P.G. testified that the father of H.N.M. and M.D.M. often abused her mentally, physically, and emotionally. She admitted that she had to call the police to intervene in some of the fights and that she had sought refuge from the abuse at a women's shelter on at least one occasion.

Evidence was also adduced pertaining to domestic violence between P.G. and S.L. At trial, P.G. characterized the altercations between herself and S.L. as "regular struggling," yet after the stabbing incident, she told McAfee that she and S.L. had physically fought and that she had been hit and knocked down by S.L. Both P.G. and S.L. admitted that at some time during the course of the stabbing altercation, B.M.L.'s head was bumped on a door frame.

The record also reflects a violent altercation between P.G. and her neighbor, Chris Will ("Will"). Russell Driver ("Driver"), a Gainesville police officer, testified that one night, shortly after the children were removed by TDPRS, he responded to a call concerning a stabbing incident involving P.G. and Will. Driver testified that at the scene P.G. had admitted stabbing Will with the knife, but alleged that Will had first assaulted her. At trial, P.G. testified that she did not recall getting into an altercation with Will. Although he had been drinking at the time of the altercation, Will testified that to the best of his recollection, P.G. had stabbed him. He further testified that he told officers he believed that the altercation occurred because he and P.G. had a "relation," and he had told S.L. about it earlier that day.

The evidence demonstrates that P.G. continuously abused drugs, even during her pregnancies. At trial, P.G. testified that she had experimented over the years with cocaine, methamphetamines, marijuana, and acid. She also admitted to drug use during her pregnancy with H.N.M., although she maintained that such drug use ceased when she realized she was pregnant. She indicated that the father of H.N.M. had introduced her to drugs and that he had used several illegal drugs during her pregnancy. Ann Barts ("Barts"), an investigative caseworker for TDPRS, testified that P.G. had told her on a prior occasion that she felt guilty that H.N.M. was born hydrocephalic due to P.G.'s cocaine use during her pregnancy. However, P.G. maintained at trial that H.N.M.'s medical problems were not related to her drug use during pregnancy.

After her failed suicide attempt and the birth of B.M.L., P.G. tested positive for several types of drugs, including amphetamines. At trial, P.G. admitted that she had attempted to commit suicide during her pregnancy with B.M.L. When asked what drugs she had taken in her attempt to overdose, she stated, "Everything I could get my hands on." The evidence demonstrates that S.L. was also abusing

marijuana, crank, and alcohol on a regular basis prior to removal of the children. P.G.'s drug abuse continued even after the children were removed. The record indicates numerous occasions on which P.G. tested positive for drugs or failed to take a requested drug screen as required by TDPRS's service plans. Additionally, even during the pregnancy of her fifth child,[3] P.G. tested positive for methamphetamines.

The record suggests that P.G. often lacked emotional stability. P.G. admitted at trial that she suffered from depression and had been diagnosed as mildly bipolar. While pregnant with B.M.L., P.G. attempted to take her own life by overdosing on drugs. According to Barts, after her suicide attempt, P.G. indicated that "she was planning on taking herself and her baby out of this world." She also told Barts that she had thought about suicide all of her life. On at least one occasion, P.G. threatened suicide again after her children were removed from her care.

P.G. contends that none of the incidents of bad conduct occurred in the children's presence or in a manner that could have negatively affected the children. However, the record reflects that the children were present during some incidents of violence and abuse. At trial, P.G. acknowledged that J.T.G. had witnessed several instances of emotional abuse by H.N.M. and M.D.M.'s father. Additionally, J.T.G. told his therapist, Shelly Butler ("Butler"), that he had witnessed domestic violence between P.G. and S.L. Butler testified that J.T.G. was heavily affected by the violence he witnessed at home, and, as a result, seemed resentful towards his mother. Patricia Doughty, Court Appointed Special Advocate ("CASA") and guardian ad litem

for the children, also testified that the children had witnessed violent episodes between P.G. and her significant others in the home. The evidence also indicates that P.G.'s drug use during pregnancy could have negatively affected the children. According to P.G.'s obstetrician, Dr. Thomas Currier, the use of amphetamines during pregnancy can cause long-term side effects such as learning defects, failure to thrive, and damage to the neural system.

■ P.G. also contends that poverty is not sufficient to support the termination of her parental rights. We agree that poverty is not sufficient to establish an endangering environment. *Doyle v. Tex. Dept. of Protective & Regulatory Servs.*, 16 S.W.3d 390, 398 (Tex.App.-El Paso 2000, pet. denied). In this case, however, P.G.'s poverty is not a seminal aspect of the jury's endangerment findings. Other evidence, outlined above, supports these findings. Therefore, P.G.'s argument based on poverty fails.

We have carefully reviewed the entire record. Looking at all the evidence in the light most favorable to the jury's finding, giving due consideration to evidence that the fact finder could reasonably have found to be clear and convincing, we hold that a reasonable trier of fact could have formed a firm belief or conviction that P.G. knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being and that she engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being.

P.G. challenges the legal and factual sufficiency of all four of the statutory grounds

**3.** The fifth child was removed from P.G.'s care after his birth and is not a subject of this suit.

for termination pleaded by TDPRS. However, when multiple grounds for termination are sought and the trial court submits the issue using a broad-form question, we must uphold the jury's findings if any of the grounds for termination support the jury's finding; only one finding under section 161.001(1) is necessary to support a judgment of termination. TEX. FAM.CODE ANN. § 161.001(1); *D.M.*, 58 S.W.3d at 813; *In re S.F.*, 32 S.W.3d 318, 320 (Tex.App.-San Antonio 2000, no pet.); *see also Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990) (op. on reh'g). Accordingly, because we conclude there is both legally and factually sufficient evidence to support the jury's findings under family code section 161.001, subsections D and E, we need not address P.G.'s remaining points with respect to the jury's findings under section 161.001, subsections 0 and P. TEX. FAM.CODE ANN. § 161.001(1)(D), (E), (O), (P); *see* TEX.R.APP. P. 47.1. We overrule P.G.'s first and second points.

### B. Jury Charge

In her third point, P.G. complains that the trial court erred by refusing to submit her requested jury instructions and questions. At trial, the court submitted a jury instruction that set forth the statutory grounds alleged against P.G. in the disjunctive, followed by a broad-form jury question regarding whether the parent-child relationship between P.G. and each child should be terminated. P.G. made a

timely objection to the jury charge and requested a supplemental instruction and question. P.G.'s requested charge included an instruction regarding the constitutional magnitude of parental rights and a question that required the jury to find that P.G. was unfit as a parent [4] before considering the best interest of the children. The trial court overruled her objection and denied her requested jury charge.

### 1. Standard of Review

The standard of review for a jury charge is abuse of discretion. *E.B.*, 802 S.W.2d at 649. To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary or unreasonable. *See Carpenter v. Cimarron Hydrocarbons Corp.*, 98 S.W.3d 682, 687 (Tex.2002); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Downer*, 701 S.W.2d at 241–42.

Pursuant to the Texas Rules of Civil Procedure, a trial court is required to submit "such instructions and definitions as shall be proper to enable the jury to

---

4. P.G.'s requested charge is as follows:

It is cardinal that the custody, care, and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the State can neither supply nor hinder. The State's interest in protecting the children does not outweigh a fit parent's interest in the care, custody, and control of their children. The State should not impose its judgment over the judgment of a parent who is found to be fit. So long as a parent adequately cares for his or her children (i.e., is

fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children. [citations omitted]

Before you may terminated [sic] the rights of any parent, you must find that each and every parent before you today is in all things an unfit parent.

. . . .

[Question:] We find that [parent] is an unfit parent as to the child [child's name]?

render a verdict." TEX.R. CIV. P. 277. Trial courts are afforded considerable discretion in deciding what instructions are necessary and proper in submitting issues to the jury. *State Farm Lloyds v. Nicolau*, 951 S.W.2d 444, 451 (Tex.1997). For an instruction to be proper, it must (1) assist the jury, (2) accurately state the law, and (3) find support in the pleadings and the evidence. *Tex. Workers' Comp. Ins. Fund v. Mandlbauer*, 34 S.W.3d 909, 912 (Tex.2000); *see* TEX.R. CIV. P. 289. Error in a jury charge is reversible only if it probably caused the rendition of an improper judgment or probably prevented the appellant from properly presenting the case on appeal. *In re D.I.B.*, 988 S.W.2d 753, 756 & n. 10 (Tex.1999); *Tex. Dep't of Human Servs. v. White*, 817 S.W.2d 62, 63 (Tex.1991); *see* TEX.R.APP. P. 44.1(a)

### 2. Error Analysis

Relying on *Troxel v. Granville*, P.G. contends that in a parental termination case a jury must consider the rights of the parents before any other consideration. 530 U.S. at 65, 120 S.Ct. at 2060. She maintains that a jury charge that places the interest of the child over the fundamental rights of the parent is erroneous.

 The charge in this case, however, did not subject the interests of the parent to the interests of the children or vice versa. The charge simply asked whether the pleaded termination grounds were established by clear and convincing evidence and whether termination was in the best interest of the children. It is well settled law that a jury charge that tracks the statutory language and then asks the controlling question does not amount to an abuse of discretion. *E.B.*, 802 S.W.2d at 649. In parental termination cases, the controlling question is whether the relationship between the parent and each child should be terminated. *Id.* The charge as submitted to the jury at trial tracked the statutory language, asked the controlling question, and assisted the jury in reaching its verdict. Moreover, a trier of fact is "not required to find that the parent is 'unfit' in order to find that termination is in the best interest of the child." *In re S.H.A.*, 728 S.W.2d 73, 91 (Tex.App.-Dallas 1987, writ ref'd n.r.e.). Consequently, we hold that the trial court did not abuse its discretion by refusing to submit P.G.'s requested jury charge. We cannot say that the trial court acted without any regard to guiding principles in deciding what issues were necessary and proper for submission to the jury. We overrule P.G.'s third point.

### C. Denial of Request for a Disinterested Expert Witness

 In her fourth point, P.G. contends that the trial court committed reversible error by denying her request for a disinterested expert witness. On May 1, 2002, the trial court set the final adversary hearing regarding termination of P.G.'s parental rights for January 13, 2003, and appointed a guardian ad litem for P.G. On January 9, 2003, P.G. filed an "Ex Parte Motion to Provide Funds for Forensic Expert," which was denied by the trial court. P.G. did not file a motion for continuance, nor did she announce to the trial court that she was not ready to proceed because of the lack of a forensic expert to assist in her defense.

She asserts that the trial court's refusal to provide funds to enable her to hire a forensic expert to assist in her defense constitutes a violation of due process. P.G. maintains that the services of a forensic expert were necessary for meaningful cross-examination of TDPRS's expert witness, to verify the results of the TDPRS's drug screens, and to explain that the results of her drug screens were positive due to prescription medication. She asserts

that parental termination cases are like criminal cases due to the constitutional magnitude of the rights at issue, and therefore, she contends that due process required the trial court to provide funds for expert assistance.

P.G. refers this court to holdings from three cases in support of her contention that an indigent defendant is entitled to an expert in order to prepare and present a defense. *See Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); *Terrell v. State,* 521 S.W.2d 618 (Tex.Crim. App.1975); *Detmering v. State,* 481 S.W.2d 863 (Tex.Crim.App.1972). However, all three cases address issues of appointment of experts in the criminal context. *See Ake,* 470 U.S. at 83, 105 S.Ct. at 1096; *Terrell,* 521 S.W.2d at 619; *Detmering,* 481 S.W.2d at 864. P.G. does not refer to any cases to support her contention that due process requires trial courts to provide expert assistance in parental termination cases, and we have located none. Accordingly, we decline to extend the holdings in *Ake, Terrell,* and *Detmering* to parental termination cases.

■ Moreover, we are unpersuaded that the trial court erred by denying P.G.'s request for expert assistance. P.G.'s request was made only one-and-a-half working days before trial, and upon denial of expert assistance, P.G. did not request a continuance to remedy any prejudice she might have suffered. P.G. asserts that she needed expert assistance to explain the medications she had been prescribed, why her drug screens showed positive for certain drugs, and how the positive results were derivative of the prescriptions she was taking. The record reflects that over the course of the service plans, P.G. tested positive for cocaine, opiates, benzodiazepine, and methamphetamines. Dr. Currier, P.G.'s obstetrician and a witness for TDPRS, testified that benzodiazepine was a category of drugs, which included Xanax, a depression medication he had prescribed for P.G. He also testified that Lortab, a pain medication that he had prescribed for her on one occasion, would cause a positive result for opiates. He noted that "speed" would cause a positive result for amphetamines and indicated that he did not know any doctor who would prescribe amphetamines. At trial, P.G. testified about several forms of medication that she had taken over the course of TDPRS's involvement and indicated why each medication was prescribed. In reviewing the record, it appears that the evidence that P.G. contends she was deprived of adducing was in fact admitted through the testimony of P.G. and her obstetrician. We overrule P.G.'s fourth point.

## V. S.L.'s Appeal

### A. Legal Sufficiency of the Evidence

■ In his first point, S.L. contends that the evidence is legally insufficient to support the jury's findings that he (1) knowingly placed or knowingly allowed B.M.L. to remain in conditions or surroundings that endangered her emotional or physical well-being; (2) engaged in conduct or knowingly placed B.M.L. with persons who engaged in conduct that endangered her emotional and physical well-being; (3) failed to comply with the provisions of a court order that specifically established the actions necessary for B.M.L.'s return; and (4) used a controlled substance in a manner that endangered the health and safety of B.M.L., and failed to complete a court-ordered substance abuse treatment program, or after completion of a court-ordered substance abuse treatment program, continued to abuse a

controlled substance. *See* TEX. FAM.CODE ANN. § 161.001(1)(D), (E), (O), (P).

As with P.G., the evidence supporting the jury's finding of subsection (D) endangerment is intertwined and overlaps with the evidence supporting the jury's subsection (E) endangerment finding. Thus, we consolidate our review of the evidence supporting these findings and incorporate evidence discussed above in P.G.'s sufficiency review.

As previously detailed, the record indicates a history of domestic violence involving S.L., including the incident where B.M.L.'s head was bumped on the door frame. During the incident, S.L. admitted to becoming angry, grabbing P.G. by the wrists, and struggling for control of the knife. Additionally, Jane Zygiel, a chemical dependency counselor for S.L. and P.G., testified that P.G. told her that she had suffered a history of physical abuse from S.L.

The record also indicates an extensive history of drug and alcohol addiction and abuse by S.L. At trial, S.L. admitted that he was a drug addict and an alcoholic. On the night of the stabbing altercation, S.L. admitted to drinking prior to the incident. A licensed psychologist, Dr. Chris Haberstroh, testified that S.L. told him that he was abusing marijuana, crank, and alcohol on a regular basis prior to removal of the children. He testified that S.L. admitted that he continued to drink heavily and abuse drugs, even after TDPRS became involved in the case. S.L. also failed to take several drug screens even though they were required for reunification with B.M.L. The jury could have reasonably inferred that S.L.'s failure to complete the scheduled drug screens indicated he was avoiding testing because he was using drugs. *See D.M.*, 58 S.W.3d at 813.

The evidence also demonstrated that S.L. had a history of criminal conduct. In 1998, S.L. was arrested and placed on deferred adjudication for marijuana possession in Victoria, Texas. After violating the terms of his probation, S.L. was convicted of the offense and sentenced to 180 days in jail. After moving to Gainesville, Texas, S.L. was arrested and convicted for driving with a suspended license. His probation was later revoked on the driving with a suspended license charge, and he was sentenced to three days in jail. While P.G. was pregnant with B.M.L., S.L. was arrested and convicted of a second possession of marijuana charge. He was later convicted a second time for driving with a suspended license. As a result, his probation was revoked and he was sentenced to thirty days in jail with credit given for fifteen days of jail time served before the revocation hearing.

Viewing the evidence in the light most favorable to the jury's finding, we hold that a reasonable trier of fact could have formed a firm belief or conviction that S.L. knowingly placed or knowingly allowed B.M.L. to remain in conditions or surroundings that endangered her physical or emotional well-being and that he engaged in conduct or knowingly placed B.M.L. with persons who engaged in conduct that endangered her physical or emotional well-being. As discussed above, we need not address S.L.'s remaining points with respect to the jury's finding's under section 161.001, subsections O or P. TEX. FAM.CODE ANN. § 161.001(1)(O), (P); *see* TEX.R.APP. P. 47.1. We overrule S.L.'s first point.

## B. Peremptory Challenges

In his second point, S.L. contends that the trial court erred by denying him a sufficient number of peremptory challenges. He asserts that the three fathers of P.G.'s children who were involved in the suit were antagonistic to each other because each father was a separate party

who made a separate presentation in voir dire. Thus, he contends each father was entitled to six peremptory challenges instead of six challenges total.

 Whether antagonism exists between parties is a question of law for the trial court. *Garcia v. Cent. Power & Light Co.*, 704 S.W.2d 734, 736 (Tex.1986). We review all questions of law de novo. *See Garner v. Long*, 49 S.W.3d 920, 922 (Tex.App.-Fort Worth 2001, pet. denied). As a general rule, each party to a civil case in district court is entitled to six peremptory challenges. TEX.R. CIV. P. 233. In multiparty litigation, the trial judge has a duty to determine "whether any of the litigants aligned on the same side of the docket are antagonistic with respect to any issue to be submitted to the jury, before the exercise of peremptory challenges." *Id.* In determining whether antagonism exists, the trial court must consider the pleadings, information disclosed by pretrial discovery, information and representations made during voir dire, and any information brought to the attention of the trial court before the parties exercise their peremptory strikes. *See Garcia,* 704 S.W.2d at 737. Antagonism must exist regarding an issue of fact between the parties on the same side of the docket, rather than because of differing conflicts with the other side of the docket. *Patterson Dental Co. v. Dunn,* 592 S.W.2d 914, 918 (Tex.1979). If the trial court errs in the allocation of peremptory challenges, reversal is required if the complaining party demonstrates either that the trial was materially unfair or that the trial was hotly contested and the evidence sharply conflicting. *See id.* at 920–21.

In reviewing the record, we find no conflict between the three fathers as to any issue of fact that was submitted to the jury. The jury was only asked to determine whether based on the evidence the parental rights of each father should be terminated with respect to that father's child or children. Each father was only antagonistic with respect to TDPRS. Accordingly, we hold that the trial court did not err in denying each father six peremptory challenges because no antagonism existed between the fathers. *Accord Am. Cyanamid Co. v. Frankson,* 732 S.W.2d 648, 652 (Tex.App.-Corpus Christi 1987, writ ref'd n.r.e.). We overrule S.L.'s second point.

**C. Introduction of Extraneous Acts and Character Evidence**

 In his third point, S.L. complains that the trial court erred by admitting evidence of his prior bad acts. Over S.L.'s objection, the trial court allowed into evidence a document placing S.L. on deferred adjudication for possession of marijuana, a judgment convicting S.L. of a second possession of marijuana charge, an order revoking S.L.'s probation based upon a conviction for driving while his license was suspended, and a judgment convicting S.L. a second time for driving with a suspended license.[5] S.L. contends that the aforementioned evidence was inadmissible based on rule 404(b) of the Texas Rules of Evidence. TEX.R. EVID. 404(b). He also contends that the evidence was inadmissible for impeachment purposes under rule 609(a) because he never denied that any of the offenses occurred. TEX.R. EVID. 609(a). He maintains that the evidence was introduced solely to prejudice the jury.

**1. Standard of Review**

---

**5.** S.L. also complains that the trial court erred in admitting a document into evidence that adjudicated his guilt for the first possession of marijuana charge. However, at trial,

the judge ruled this document inadmissible based on an objection that it was repetitious. Therefore, we will not address S.L.'s complaint concerning this document.

A trial court's rulings in admitting or excluding evidence are reviewable under an abuse of discretion standard. *Nat'l Liab. & Fire Ins. Co. v. Allen,* 15 S.W.3d 525, 527 (Tex.2000). An appellate court must uphold the trial court's evidentiary ruling if there is any legitimate basis in the record for the ruling. *Owens–Corning Fiberglas Corp. v. Malone,* 972 S.W.2d 35, 43 (Tex.1998).

### 2. Parental Conduct

 Termination of parental rights based upon subsection (D) and/or (E) focuses on the conduct of the parent. *See Avery v. State,* 963 S.W.2d 550, 553 (Tex. App.-Houston [1st Dist.] 1997, no writ). Evidence of criminal conduct, convictions, and imprisonment prior to the birth of a child is relevant to the issue of whether a parent engaged in a course of conduct that endangered the child's well-being. *See S.F.,* 32 S.W.3d at 322.

The evidence regarding S.L.'s prior criminal behavior, convictions, and imprisonment was not offered to prove conduct in conformity or to impeach his credibility as a witness. *See* TEX.R. EVID. 404(b), 609(a). Instead, it was relevant and probative to whether he engaged in a course of conduct that endangered B.M.L. Accordingly, we hold that the trial court did not abuse its discretion by admitting the evidence. We overrule S.L.'s third point.

### VI. CONCLUSION

Having overruled each of P.G.'s points and each of S.L.'s points, we affirm the trial court's judgment.