

## Fourth Court of Appeals
### San Antonio, Texas

**MEMORANDUM OPINION**

No. 04-24-00322-CV

**IN THE INTEREST OF E.A.G.C.**

From the 150th Judicial District Court, Bexar County, Texas
Trial Court No. 2022PA01121
Honorable Monique Diaz, Judge Presiding

Opinion by:     Liza A. Rodriguez, Justice

Sitting:        Rebeca C. Martinez, Chief Justice
                Luz Elena D. Chapa, Justice
                Liza A. Rodriguez, Justice

Delivered and Filed: October 30, 2024

AFFIRMED

Melissa G. appeals from the trial court's order terminating her parental rights to her two-year-old daughter E.A.G.C.[1] On appeal, she argues the evidence is legally and factually insufficient to support the trial court's findings under section 161.001(b)(1)(D), (E), and (P). She further argues that the trial court erred in appointing the Department of Family and Protective Services as permanent managing conservator of E.A.G.C. We affirm.

---

[1]To protect the identity of the minor child, we refer to the child and the parties by fictitious names, initials, or aliases. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

## STANDARD OF REVIEW

To terminate parental rights pursuant to section 161.001 of the Texas Family Code, the Department has the burden to prove by clear and convincing evidence that parental rights should be terminated pursuant to one of the predicate grounds in subsection 161.001(b)(1) and that termination of parental rights is in the best interest of the child. TEX. FAM. CODE § 161.001(b)(1), (2). In reviewing the legal sufficiency of the evidence to support these findings, we look "at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). In reviewing the factual sufficiency of the evidence, we consider disputed or conflicting evidence. *Id.* at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). Under these standards, the factfinder is the sole judge of the weight and credibility of the evidence. *Id.*

## SUBSECTIONS (D) AND (E)

Subsection (D) allows termination of parental rights if, along with a best-interest finding, the factfinder finds by clear and convincing evidence that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(D). "A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards." *In re C.J.G.*, No. 04-19-00237-CV, 2019 WL 5580253, at *2 (Tex. App.—San Antonio Oct. 30, 2019, no pet.) (quoting *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston

[14th Dist.] 2014, pet. denied)). Subsection (E) allows termination of parental rights if the trial court finds by clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E). Under subsection (E), the trial court must determine "whether there is evidence that a parent's acts, omissions, or failures to act endangered the child's physical or emotional well-being." *In re C.J.G.*, 2019 WL 5580253, at *2.

Under both subsections (D) and (E), "endanger" means "to expose a child to loss or injury, or to jeopardize a child's emotional or mental health." *Id*. at *3 (citing *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996)). "[A] parent need not know for certain that the child is in an endangering environment; awareness of such a potential is sufficient." *Id*. at *2 (quoting *In re R.S.-T.*, 522 S.W.3d 92, 109 (Tex. App.—San Antonio 2017, no pet.)) (alteration in original). "Under subsection (D), a trial court considers 'evidence related to the environment of the children to determine if the environment was the source of endangerment to the children's physical or emotional well-being.'" *In re J.A.B.*, No. 04-23-00907-CV, 2024 WL 1421986, at *2 (Tex. App.—San Antonio Apr. 3, 2024, pet. denied) (quoting *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.)). "Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child." *Id*. (quoting *In re J.T.G.*, 121 S.W.3d at 125). "For example, abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child." *Id*. (quoting *In re J.T.G.*, 121 S.W.3d at 125). "Parental and caregiver illegal drug use and drug-related criminal activity likewise supports the conclusion that the children's surroundings endanger their physical or emotional well-being." *Id*. (quoting *In re J.T.G.*, 121 S.W.3d at 125). "Similarly, under subsection (E), '[a]n endangerment finding often involves physical endangerment, but the statute

does not require that the parent's conduct be directed at the child or that the child suffer actual injury.'" *Id*. (quoting *In re K.J.G.*, No. 04-19-00102-CV, 2019 WL 3937278, at *5 (Tex. App.— San Antonio Aug. 21, 2019, pet. denied)) (alteration in original). "Rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone." *Id*. (quoting *In re K.J.G.*, 2019 WL 3937278, at *5). "Conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *Id*. (quoting *In re K.J.G.*, 2019 WL 3937278, at *5). "Thus, evidence of illegal drug use by a parent and its effect on a parent's life and her ability to parent may establish an endangering course of conduct under subsection (E)." *Id*. (quoting *In re K.J.G.*, 2019 WL 3937278, at *5).

"While 'endanger' has the same definition under both subsections (D) and (E), 'there are some distinctions in the application of subsections (D) and (E).'" *Id.* at *3 (quoting *In re C.J.G.*, 2019 WL 5580253, at *3). "Termination under subsection D may be based upon a single act or omission." *Id*. "In contrast, termination under subsection E 'may not rest on a single act or omission; it must be a voluntary, deliberate, and conscious course of conduct.'" *Id*. (quoting *In re C.J.G.*, 2019 WL 5580253, at *3). Additionally, "[i]n evaluating endangerment under subsection D, we consider the child's environment *before* the Department obtained custody of the child." *In re C.J.G.*, 2019 WL 5580253, at *3 (quoting *In re S.R.*, 452 S.W.3d at 360) (emphasis added). "Under subsection E, however, courts may consider conduct *both before and after* the Department removed the child from the home." *Id*. (quoting *In re S.R.*, 452 S.W.3d at 360) (emphasis added).

The supreme court has explained that "the endangering conduct may include the parent's actions before the child's birth, while the parent had custody of older children, including evidence of drug usage." *In re J.O.A.*, 283 S.W.3d at 345. Thus, "a parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *Id*. "While illegal

drug use alone may not be sufficient to show endangerment, a pattern of drug use accompanied by circumstances that indicate related dangers to the child can establish a substantial *risk* of harm." *In re R.R.A.*, 687 S.W.3d 269, 278 (Tex. 2024) (emphasis in original). "A reviewing court should not evaluate drug-use evidence in isolation; rather, it should consider additional evidence that a factfinder could reasonably credit that demonstrates that illegal drug use presents a risk to the parent's 'ability to parent.'" *Id.* (quoting *In re J.O.A.*, 283 S.W.3d at 345).

Here, there was evidence presented from which the trial court could conclude Melissa F. had a pattern of illegal drug use, both before and after removal of E.A.G.C., that presented a risk to her ability to parent. Department caseworker Leah Jarma testified Melissa F. had a history of substance abuse in two previous cases involving Melissa F.'s other children. Prior to E.A.G.C.'s removal, Melissa F.'s parental rights had been terminated with respect to a fifteen-year-old son and a seven-year-old son. According to Jarma, with respect to the two prior terminations, Melissa F. said "she had completed some of her services. However, she admitted to relapsing prior to the ter—terminations happening."

Indeed, Melissa F. testified that E.A.G.C. was her third child and that her rights to her two other children had been terminated. According to Melissa F., she had completed her service plan for her oldest child and was supposed to be reunified when Melissa F.'s sister died. Melissa F. said that as a result of her sister's death, she "lost it" and relapsed. With respect to her second child, Melissa F. admitted that she had been "using while [she] was pregnant" and that both she and her child tested positive for illegal drugs at the birth of her second child. Melissa F. testified that she had been "tricked" into signing her rights away to this second child, stating that she had completed all her services when a new caseworker said she had not. According to Melissa F., the Department "used my—my ex-husband for shooting and killing my dad against me to terminate my rights to

my daughter." Melissa F. testified she "was clean at that time" and that her "lawyer tricked [her] into signing [her] rights by telling [her] if [she] had another kid, CPS was going to take them away."

Jarma testified that Melissa F.'s "drug use was the main concern. She was caring for [E.A.G.C.] while she was using substances." When Jarma interviewed Melissa F., Melissa F. said

> it had been something she had been struggling with for a long time. She has periods of her life where she could stay clean, but there were periods where she would experience stressors and relapse. And she was in current relapse at that time and was using when [E.A.G.C.] was removed.

Jarma testified that Melissa F. said her drug of choice was methamphetamine. During her testimony, Melissa F. testified that she told Jarma her drug of choice was heroin.

E.A.G.C. was removed in July 2022 when she was six months old. Melissa F. testified that E.A.G.C. was in her care for six months and that during that time, she had placed E.A.G.C. with her mom at various times. Melissa F. testified, "[E.A.G.C.] was back and forth with me and my mom, because I was—when I was using, I was staying at my mom's." Melissa F. testified that at the time E.A.G.C. was removed, she had relapsed and her probation officer was helping her get into the methadone program. According to Melissa F., her relapse is what led to E.A.G.C. being removed by the Department.

Jarma testified that in September 2022, results of Melissa F.'s hair follicle test showed that "she had used within the last month of that test." Jarma testified that Melissa F. "was doing a drug treatment program with parole, so she was doing individual and group counseling for drug treatment." Melissa F. was also in "a medication-assisted treatment program, more commonly known as a methadone clinic." Melissa F.'s drug tests were consistent with her being on methadone.

Department supervisor Tamatha Burnett testified that when Jarma was Melissa F.'s caseworker, the Department's goal was family reunification because Melissa F. was making progress. According to Burnett, the Department's goal changed to termination when Melissa F.'s drug tests started to come back positive. Burnett testified that termination was in E.A.G.C.'s best interest because of Melissa F.'s pattern of substance abuse:

> The history of Ms. Melissa's involvement with the agency, and all those [prior] cases have been drug related. She has completed the majority of her services on each one of those cases and it's a pattern. This—this would be a pattern for her and so that's concerning.

Plaintiff's Exhibit 5, which was admitted into evidence, contains Melissa F.'s drug test results from various days. A hair follicle taken from Melissa F. on December 23, 2022 was positive for amphetamine, methamphetamine, and opiates (morphine). It contained a notation that the certified medical review officer's "DETERMINATION/VERIFICATION IS: POSITIVE UNTIL FURTHER VERIFICATION OF PRESCRIPTIONS." A hair follicle taken from Melissa F. on April 24, 2023 was positive for amphetamine and methamphetamine. The certified medical review officer's "DETERMINATION/VERIFICATION IS: POSITIVE UNTIL FURTHER VERIFICATION OF PRESCRIPTIONS." A hair follicle taken from Melissa F. on September 1, 2023, was positive for methamphetamine. The certified medical review officer's "DETERMINATION/VERIFICATION IS: POSITIVE." A hair follicle taken from Melissa F. on November 1, 2023, was positive for methamphetamine. The certified medical review officer's "DETERMINATION/VERIFICATION IS: POSITIVE."

Burnett testified that when asked what caused these positive drug tests, Melissa F. said her psychotropic prescription medications were causing the positive results. According to Melissa F., since January 25, 2023, she had been taking Fluoxetine. Since June 5, 2023, she had been taking Alprazolam, Venlafaxine, Aripiprazole, and Trazadone. Burnett testified that she then contacted

the Department's substance abuse person and asked whether Melissa F.'s prescription medications could cause the positive test results and determined the medications were not the cause.

Sherrell Gibbs, a substance use program specialist with the Department, testified that her "day-to-day activities consist of assisting the field, specifically CPS field workers, to assess the clients' substance use issues, and interpret drug test results." She acts as a liaison between health and human services and treatment providers. She was qualified as an expert witness "in the area of the ability to determine drug test results and interpret levels and interpret the results of whether they could be from a valid prescription or just from illegal" substances. Gibbs testified she was familiar with the psychotropic medications prescribed to Melissa F. According to Gibbs, none of those prescribed medications would result in a positive methamphetamine drug test. Gibbs explained that there were three prescription medications that would produce a positive methamphetamine result: one with a brand name of "Digoxin," one called "Levomethamphetamine," and one called "Benzphatamine." Gibbs testified that other than those three prescription medications, any positive methamphetamine result would be caused by "[i]Illicit methamphetamine[]." From this testimony, the trial court could reasonably conclude that because Melissa F. was not prescribed Digoxin, Levomethamphetamine, or Benzphatamine, her positive results for methamphetamine were caused by illegal methamphetamine use.

Gibbs then continued to discuss Melissa F.'s drug test results. Gibbs was asked whether she could determine if a positive result was from "illicit drugs" or prescribed drugs. Gibbs testified that when there is a methamphetamine positive result "and the client disputes it," the Department then does "isomer testing." Gibbs explained that methamphetamine "has two isomers": "a D/Isomer, dextro-methamphetamine[], and an L/Isomer, level-methamphetamine[]." The sample

in question is "retested at the lab to break down what has caused the positive." Gibbs was asked whether "an isomer test done in this particular case." Gibb replied, "Yes, there was."

Gibbs explained that the first test at the "collection site" is performed by Texas Alcohol and Drug Testing Service. According to Gibbs, the first result can determine whether methamphetamine was ingested. To confirm the results with an isomer test, the sample is sent to Quest. The "D/L Isomer test will [determine] whether it is illicit versus prescription." In looking at Melissa F.'s methamphetamine and amphetamine positive results for a hair follicle collected on December 23, 2022, Gibbs testified the first test and the second isomer test had the same results. Similarly, when asked to look at positive methamphetamine and amphetamine results for a specimen collected on April 24, 2023, Gibbs testified her interpretation of the first report by Texas Alcohol was "[t]hat methamphetamine was used." She further testified that when the second Quest isomer test was done, the results were the same as the first test. Gibbs was then asked about a positive methamphetamine result for a hair follicle collected on September 1, 2023. Gibbs concluded from the result that because only methamphetamine was present, the positive result was either "due to exposure, the client was either in an environment where methamphetamine[] was present on a daily basis and its—the environment is contaminated, or that methamphetamine[] was ingested but the amphetamine[] level went below the threshold of the 500 cutoff mark." The methamphetamine result for the September 1, 2023 hair follicle was 19886 pg/mg. Gibbs was asked whether she would expect to have a methamphetamine positive result of the levels of 19886 if it was an isolated incident. Gibbs replied, "The environment would have to be significantly contaminated and be in that environment on a day-to-day basis—a daily living environment."

Gibbs then testified about a sample collected from Melissa F. on December 26, 2023. She testified that an isomer test was conducted on this hair follicle sample and that "[t]he test result

showed a D and an L Isomer. The D was at the 90 percent and L was at 9 which would indicate methamphetamine[].” Gibbs again testified that the only prescription drugs that could give this result are Digoxin, Levomethamphetamine, and Benzphetamine.

Gibbs further testified about hair follicle tests, explaining that the ends of the hair follicle are not tested. Instead, the hair follicle is collected an inch and a half from the scalp and that inch and a half is tested. According to Gibbs, the hair an inch and a half from the scalp gives a timeframe for the past ninety days. Gibbs testified that hair follicle tests “can detect the use as early as fourteen days after the use has occurred.” Gibbs was asked, hypothetically, about a client who stopped taking a prescribed medication in March 2023. Would that medication show up on a hair follicle test conducted in December 2023? Gibbs replied that it would not because the hair follicle test would capture only the previous ninety days, or “from December back to September.”

In looking at all this evidence in the light most favorable to the trial court’s findings, the trial court could have reasonably formed a firm belief or conviction that even before E.A.G.C. was removed, Melissa F. had a pattern of illegal drug use, a pattern that had previously led to the termination of her rights to two previous children, which contributed to an environment that endangered E.A.G.C. *See In re J.A.B.*, 2024 WL 1421986, at *2. We therefore hold the evidence is legally sufficient to support the trial court’s finding under subsection (D). Similarly, with regard to factual sufficiency, we conclude that in considering the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding was not so significant that the trial court could not reasonably have formed a firm belief or conviction under subsection (D). *See In re J.O.A.*, 283 S.W.3d at 345. Therefore, we hold the evidence is also factually sufficient to support the trial court’s finding under subsection (D).

With regard to subsection (E), we conclude that in looking at all this evidence in the light most favorable to the trial court's findings, the trial court could have reasonably formed a firm belief or conviction that before and after the time E.A.G.C. was removed, Melissa F. had a pattern of illegal drug use, a pattern that had previously led to the termination of her rights to two previous children, which endangered E.A.G.C.'s physical or emotional well-being under subsection (E). *See In re J.A.B.*, 2024 WL 1421986, at *2 Therefore, we hold the evidence is legally sufficient to support the trial court's findings under subsection (E).

Melissa F. argues that the finding under subsection (E) is factually sufficient by arguing that Gibbs's testimony was not sufficiently specific and by pointing to evidence that Melissa F. had not relapsed during the pendency of this case. As explained above in detail, Gibbs's testimony was sufficient for the trial court to reasonably conclude that Melissa F.'s hair follicle positive test results were a result of illicit drug use and not because of prescription use. As for her second point, Melissa F. testified she believes her positive results were caused by her prescription medications. Christopher Lopez, a program director and addiction counselor at New Season San Antonio Treatment Center, testified Melissa F. had perfect attendance in the program and her last positive urine drug screen was on February 15, 2023 for opioids. He testified Melissa F.'s urine drug tests with Cordant, a lab used by New Season San Antonio Treatment Center, had been negative since February 15, 2023. In considering this evidence, however, we note that the trial court, as factfinder, is the sole judge of the weight and credibility of the evidence. *See In re J.O.A.*, 283 S.W.3d at 345. Thus, the trial court could have found it significant that the Cordant testing results relied on by Melissa F. were urine drug tests and not hair follicle tests. The trial court could have concluded that the follicle screening as explained by Gibbs was more accurate of detecting drug use. The trial court also could have not found Melissa F. to be a credible witness. Therefore, in looking at all the

evidence, including the disputed or conflicting evidence, we hold the evidence was factually sufficient to support the trial court's finding under subsection (E).[2]

## CONSERVATORSHIP

Melissa F. further argues that the trial court abused its discretion by appointing a nonparent as managing conservator. An order terminating the parent-child relationship divests the parent and the children of all legal rights and duties with respect to each other. TEX. FAM. CODE § 161.206(b). Because we have overruled Melissa F.'s complaints about the parts of the judgment terminating her parental rights, Melissa F. has been divested of her legal rights and duties related to E.A.G.C. *See In re A.K.B.*, No. 04-23-00154-CV, 2024 WL 3056663, at *27 (Tex. App.—San Antonio June 20, 2024, no pet.) (citing TEX. FAM. CODE § 161.206(b)). Accordingly, Melissa F. lacks standing to challenge the portion of the judgment appointing the Department as E.A.G.C.'s managing conservator. *See id.*; *In re R.J.*, 579 S.W.3d 97, 120-21 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (holding father did not have standing to challenge the portion of the judgment appointing a conservator for the child after overruling father's challenge to the portion of the judgment terminating his parental rights); *E.A. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-15-00811-CV, 2016 WL 1639847, at *4 (Tex. App.—Austin Apr. 21, 2016, pet. denied) (affirming judgment terminating parental rights and holding that parents, who had been divested of their legal rights to child, could not challenge conservatorship determination).

---

[2]Having determined there is legally and factually sufficient evidence to support the trial court's findings under subsections (D) and (E), we need not consider Melissa F.'s argument that there was legally and factually insufficient evidence to support the trial court's finding under subsection (P). *See In re D.J.H.*, 381 S.W.3d 606, 611-12 (Tex. App.—San Antonio 2012, no pet.) (explaining that when the trial court terminates the parent-child relationship on multiple grounds under section 161.001(1), we may affirm on any one ground because, in addition to finding that termination is in the child's best interest, only one predicate violation under section 161.001(1) is necessary to support a termination decree).

**COUNSEL COMPENSATION**

Finally, Melissa F.'s appointed appellate counsel "requests that this court order that he be compensated for his services in excess of the maximum out-of-court hours allowed in the Joint Order Adopting Ad Litem Fee Schedule." Melissa F.'s appointed counsel does not cite any legal authority that would allow this court to issue such an order, and we decline to do so.

**CONCLUSION**

For the reasons stated above, the trial court's order terminating Melissa F.'s parental rights is affirmed.

Liza A. Rodriguez, Justice