*Court Of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*



# MEMORANDUM OPINION

No. 04-09-00500-CV

In the Interest of **J.C.R.**, a Child

From the 81st Judicial District Court, Frio County, Texas
Trial Court No. 08-07-00165-CVF
Honorable Paul Gallego, Judge Presiding

Opinion by:    Karen Angelini, Justice

Sitting:    Karen Angelini, Justice
Rebecca Simmons, Justice
Steven C. Hilbig, Justice

Delivered and Filed: June 16, 2010

AFFIRMED

This is an appeal from an order terminating Connie Ramirez's parental rights to J.C.R. Ramirez argues that the evidence is legally and factually insufficient to support the trial court's findings. We affirm.

## BACKGROUND

The Department of Family and Protective Services ("the Department") brought this parental termination case, which was tried before the court over a period of several days in June and July of 2009. After hearing the evidence, the trial court ordered termination of Ramirez's parental rights as well as those of J.C.R.'s father, Lonnie Rodriguez. Rodriguez has not appealed; thus, the termination of Ramirez's parental rights is the only subject of this appeal.

The trial court found that (1) Ramirez knowingly placed or knowingly allowed J.C.R. to remain in conditions or surroundings which endanger the physical or emotional well-being of the child (Texas Family Code §161.001(1)(D)); (2) engaged in conduct or knowingly placed J.C.R. with persons who engaged in conduct which endangers the physical or emotional well-being of J.C.R. (Texas Family Code §161.001(1)(E)); and (3) failed to comply with the court-ordered service plan[1] (Texas Family Code §161.001(1)(O)). The trial court also found that termination was in J.C.R.'s best interest. Ramirez does not contest this finding on appeal.

### APPELLATE REVIEW OF PARENTAL TERMINATION ORDERS

We apply the clear and convincing standard of proof in parental termination cases. *In the Interest of C.H.*, 89 S.W.3d 17, 25 (Tex. 2002); *In the Interest of T.N.S.*, 230 S.W.3d 434, 438 (Tex. App.—San Antonio 2007, no pet.). Clear and convincing evidence is defined as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2008). When reviewing for legal sufficiency in a parental termination case, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In the Interest of J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). When reviewing for factual sufficiency in a parental termination case, we consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *Id.* If, in light of the entire record, the disputed evidence that a

---

[1] The Department is not disputing Ramirez's argument regarding the trial court's finding that she failed to comply with the court-ordered service plan, noting that only one statutory predicate ground is necessary to support termination of parental rights. Therefore, we will not address this ground of termination on appeal.

reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

The provisions of the Family Code pertinent to this appeal are subsections 161.001(1)(D) and (E). Subsection 161.001(1)(D) provides that a trial court may order termination of the parent-child relationship if it finds that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(1)(D) (Vernon 2008). Subsection 161.001(1)(E) provides that a trial court may order termination of the parent-child relationship if it finds that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id*. at §161.001(1)(E).

Endangerment is defined as exposing to loss or injury, to jeopardize. *In the Interest of J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under subsection 161.001(1)(D), we look to whether the environment of the child is the source of endangerment to the child's physical or emotional well-being. *Id.* A parent's conduct in the home can create such an environment. *Id*. Under subsection 161.001(1)(E), we look to whether the endangerment of the child is the direct result of the parent's conduct, including acts, omissions, or failures to act. *Id.* Further, termination under subsection (E) must be based on, not just a single act or omission, but a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* When the evidence pertaining to subsections 161.001(1)(D) and (E) is interrelated, we conduct a consolidated review. *Id.* at 126.

In conducting a review of a termination proceeding, it is not necessary that the parent's conduct be directed at the child or that the child actually suffer injury. *Id.* at 125. In determining whether termination is necessary, courts look to parental conduct both before and after the child's birth. *Id.* The endangering conduct may include the parent's actions before the child's birth, while the parent had custody of older children. *In the Interest of J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009).

With these factors in mind, we now consider the evidence adduced at trial concerning environmental endangerment and course of conduct endangerment of the physical or emotional well-being of J.C.R.

### THE EVIDENCE

Connie Ramirez, mother of J.C.R., testified that, before giving birth to J.C.R., she had another child, C.G., who is deceased. C.G.'s father was Benito Gutierrez. The Department had removed C.G. from her care when he was about a year old because it was discovered that he had a spiral fracture of the tibia. Ramirez does not know how the fracture occurred. The Department took temporary custody of C.G., and placed him with Ramirez's aunt, Veronica Perez. Ramirez was eventually allowed unsupervised visits with C.G. At the time of C.G.'s death, Ramirez was living with Rodriguez, and she was pregnant with J.C.R. Her eight-year-old brother, George, was also staying with them.

On July 22, 2008, Ramirez had picked up C.G., who was then two years old, from Perez's house for an unsupervised visit. Next, she left C.G. at home with Rodriguez and George and went to a therapy session at the Department at noon. When she finished with her appointment, she called Rodriguez, who told her that C.G. had recently thrown up. Ramirez returned home at about 2:00 p.m.

and saw that C.G. was in his room playing with some toys. According to Ramirez, she, Rodriguez, George, and C.G. then all took a nap. After waking from his nap at about 5:00 to 6:00 p.m., C.G. began screaming. He wanted water, but when Ramirez gave him some, he spilled it. He then collapsed in Ramirez's arms, his eyes rolled back in his head, and his feet turned blue. Ramirez had to kneel down to pick him up because of her pregnancy.

Ramirez and Rodriguez took C.G. to the car to take him to the hospital, and Ramirez called Perez and told her that C.G. was not doing well. Perez told her to bring C.G. to her house because she thought Ramirez might be exaggerating C.G.'s condition. Although Ramirez felt she should take C.G. to the hospital, she has no idea why she did not. When they got to Perez's house, Perez took C.G. outside and watched him play for a couple of seconds. Perez then took C.G. to the hospital. Ramirez testified that C.G. did not have any bruises or scratches on his body. C.G. died later that day. Ramirez testified that Rodriguez had never hit her or C.G. She also testified that she does not know whether Rodriguez murdered C.G. and she does not know who caused C.G.'s death.

J.C.R. was born the day after C.G. died. The Department immediately removed J.C.R. from Ramirez's care.

Although Rodriguez was called to the witness stand to testify, he invoked his Fifth Amendment right against self-incrimination in response to most of the questions propounded to him. Rodriguez has been charged with capital murder in connection with C.G.'s death.

Veronica Perez, Ramirez's aunt with whom C.G. was placed when he was removed from Ramirez's care in 2007, testified that C.G. lived with her for about a year. At some point, Ramirez was allowed unsupervised visits with C.G. On July 22, 2008, C.G. was with Ramirez. Ramirez called

Perez about 5:00 or 6:00 p.m. and said something was wrong with C.G. Perez told Ramirez to bring C.G. to her house. When she saw Ramirez carry C.G. out of the car, he at first looked okay. Perez asked him to come with her, but he wanted to stay with Ramirez. She saw bruises on his eye and his chin. There were also multiple bruises on his stomach and a bruise on his back. His feet were cold to the touch. Ramirez said C.G. had fallen from his bed and hit himself. Perez grabbed C.G. and took him to the hospital. C.G. was at the hospital for an hour and a half and was then airlifted to University Hospital where he died.

Dr. Allen Hackley, an emergency physician at Frio Regional Hospital in Pearsall, Texas, testified that when he first saw C.G. in the emergency room in 2008, C.G. was limp, unresponsive, lethargic, obtundent, non-arousable, and flaccid. He did not respond to verbal or noxious stimuli, except when he examined C.G.'s abdomen and back. C.G.'s abdomen was distended, and he withdrew from palpation because of pain. His abdomen was very tense or firm, and bowel sounds were absent. There was a large discolored area on his back, probably from an internal hemorrhage. There were also some facial and chest markings. By the time Dr. Hackley saw C.G., he had lost one-half to three-fourths of his blood volume internally. C.G. was grunting and groaning. Dr. Hackley's initial diagnosis was blunt force abdominal injury. It was a deliberate injury, not an accident. The injuries were too severe for C.G. to have been running around and playing moments before he was taken to the emergency room. After about twenty minutes, Dr. Hackley decided to call Medcom, the Bexar County trauma transfer to take C.G. to San Antonio because Frio Regional Hospital is not a trauma center. At that point, C.G. was in a morbid condition, about to die. According to Dr. Hackley,

C.G. should have been brought to the emergency room immediately upon the impact that led to his condition. He was obviously in need of immediate medical attention.

Pedro Salinas, a police officer with the Pearsall Police Department, went to the Frio County Hospital when C.G. was taken there after having been assaulted. The child had bruising and other unidentified markings on his body. He was panting, breathing at a very high rate, and sounded as if he was in pain. Officer Salinas took some photographs of C.G. at the hospital. The photographs show discoloration of the child's feet, purple bruising to the child's eye, small purple bruising marks on the chest, a large purple mark on the child's back, and a swollen stomach. Officer Salinas eventually spoke with both Ramirez and Rodriguez. Ramirez told him her aunt had taken C.G. to the hospital and that she had not gone to the hospital herself because her family did not want her there. She did not tell him how C.G. was injured. Rodriguez told Officer Salinas that he had struck C.G. in the stomach.

Officer Salinas also took pictures of C.G. during the autopsy. These photographs show bruising to the child's eye, a small cut above the left nipple, lacerations and bruising to the right thigh and leg, bruising on the chest, a wound on the chin, puncture wounds on the left thigh, bruising on the left knee, markings on the child's ankle and leg, and a wound on the head.

Guadalupe Olivares, a Department investigator, testified that he first became involved with C.G. when C.G. received a fractured tibia in 2007. When Olivares received the referral, he called Ramirez in and observed C.G. at his office. He observed that C.G. had bruises and scratches on him, so he directed Ramirez to take C.G. to a doctor. She took him to Christus Santa Rosa where it was discovered that C.G. had a fractured tibia. Olivares concluded there was reason to believe C.G. had

been physically abused. Olivares also investigated the incident in which C.G. received fatal injuries. He interviewed both Ramirez and Rodriguez. Ramirez had no answer for what had happened to C.G. Rodriguez told Olivares that he would take the blame and that he would not put the blame on Ramirez because she could not make it in prison.

Dr. James Lukefahr, a pediatrician and child abuse specialist, testified that he examined C.G. in July 2007, when he was thirteen months old. C.G. had multiple bruises to his face, neck and back, and he had a broken leg. He concluded these were inflicted, not accidental, injuries. The broken leg was a spiral fracture of the right tibia. The fracture was a healed fracture, meaning it was over two weeks old. It surprised him that C.G. had not been brought in sooner. For this type of injury, the child would cry and not want to move his leg for at least a week. He spoke with Ramirez, but she did not give an explanation for the injury. Dr. Lukefahr concluded the injuries were as a result of physical abuse.

Dr. Lukefahr reviewed the medical records on C.G. from the 2008 admission to University Hospital. He testified C.G. was near death as a result of multiple blunt force injuries to his abdomen. He had lacerations of his pancreas, a laceration of his spleen and possibly kidneys, and a complete tear of his small intestine. With these kinds of injuries, the patient would exhibit severe abdominal pain and probably vomiting. This is a life-threatening injury, and over a very short period of time, the patient would become critically ill. The patient would initially be crying, have trouble breathing because of the pain, then become progressively weaker and more pale and then ultimately lose consciousness. A two-year-old child with these injuries would immediately be in extreme pain and would be crying. It would be very difficult for him to move, he would not be able to walk, and he

would be immobilized by the extent of this trauma. It would not be possible for him to be walking around and acting normally after this injury had been sustained. It is concerning if a parent waited long after this kind of injury to take a child to the hospital because, instantly, upon having these injuries, the child would have appeared very seriously ill. A responsible parent would have immediately sought medical care for him. The force necessary to produce these kinds of injuries would be very high energy impact. In a two-year-old child in a home environment, it would be a kick or a punch. It is possible that C.G. survived a few hours before ultimately losing consciousness and going into shock.

Jesse Lindsey, a Department investigator, testified that he removed J.C.R. from Ramirez in the hospital. The Department had received a referral for risk of physical abuse to J.C.R. because of the severity of what occurred to C.G., the older sibling. According to the autopsy report, C.G. had suffered blunt force trauma. They were not able to determine which parent inflicted the blunt force trauma to C.G., so there was risk of physical abuse to J.C.R. Also, beyond the physical abuse, the parents did not seek medical attention in a proper expedited manner, even though they knew C.G. was sick. Lindsey was at the Frio Regional Hospital when C.G. was taken there. He observed C.G. to be in extreme distress. C.G. was strapped down on a gurney because he was flailing all over the place. C.G.'s stomach was extended so that it looked like he had a football in his stomach. He was moaning, his eyes had rolled back, he was having difficulty breathing, and he had bruises all over his body. At the hospital, Lindsey spoke with Rodriguez about what happened to C.G. Rodriguez told Lindsey that he was watching C.G. while Ramirez was at a counseling session. Rodriguez said he tried to get C.G. to eat some cereal, but C.G. threw up. Rodriguez said he tried to get C.G. up to

walk around, and he took him out to the back yard. Finally, Rodriguez said a relative was called, who saw the severity of the situation, and took C.G. to the hospital.

Lisa Huizar, a clinical social worker, saw Ramirez for individual therapy following C.G.'s death and J.C.R.'s birth. The Department referred her to address the issue of C.G.'s death and the protection of J.C.R. According to Huizar, Ramirez was unable to identify how C.G. was hurt or who had hurt C.G., and this inability to identify any risk factors would prevent Ramirez from making necessary changes in the future. Huizar expressed concern that Ramirez could not be protective of J.C.R. because Ramirez was unable to say how C.G. was hurt and because of the level of bonding with her children that Huizar observed. Further, Huizar felt Ramirez was not as compassionate as a grieving mother should be.

## DISCUSSION

The Department removed J.C.R. from Ramirez's care immediately upon J.C.R.'s birth. Thus, the State's termination case was based on the environmental and conduct endangerment involving Ramirez's older child, C.G. The evidence showed that C.G. had been removed from Ramirez's care a year before his death because he had suffered injuries, including a spiral fracture of the tibia, which Ramirez was unable to explain. According to medical testimony, C.G.'s injuries were inflicted rather than accidental. The medical testimony further showed that the fractured tibia was healed, meaning it was over two weeks old. And, according to the doctor who examined him, C.G. would have cried and not wanted to move his leg for at least a week. Thus, it was surprising to the doctor that C.G. had not been brought to the doctor sooner. Both the doctor and the Department caseworker concluded C.G. had been physically abused, resulting in C.G.'s removal from Ramirez's care. At the

time of C.G.'s death, he had been removed from Ramirez's care for a year, although Ramirez had been allowed unsupervised visits with C.G.

The bulk of the evidence at trial, however, concerned the events leading up to and surrounding C.G.'s death. The evidence showed that, during an unsupervised visit with C.G., Ramirez left C.G. with Rodriguez. When Ramirez returned home, she knew C.G. had thrown up, but otherwise indicated he was playing in his room and then took a nap. Ramirez was home with C.G. from about 2:00 p.m. until approximately 5:00 or 6:00 p.m., when he awoke from his nap and collapsed in her arms. According to Ramirez, C.G. did not have bruises or scratches on his body. After C.G. collapsed, she and Rodriguez were going to take C.G. to the hospital; however, they instead took him to the home of Ramirez's aunt, Veronica Perez. Perez realized fairly quickly that C.G. needed immediate medical attention and rushed him to the hospital.

All the testimony concerning C.G.'s condition when he arrived at the hospital indicates C.G. had suffered severe life-threatening injuries that had been inflicted upon him. He was covered in bruises and lacerations, and his stomach was very distended due to blunt force trauma. According to the medical testimony, C.G. was already near death. As it turned out, C.G. had internal injuries to his pancreas, spleen, kidney, and small intestine. According to the medical testimony, a patient with these kinds of injuries would exhibit signs of severe abdominal pain, would be crying, have trouble breathing and would not be able to walk. The medical testimony also showed that, with these kinds of injuries, a parent should have immediately taken the child to the hospital because it should have been obvious he was in need of immediate medical attention.

Thus, the evidence describing C.G.'s appearance at the hospital, including the testimony regarding his condition, is at odds with Ramirez's testimony that, during the afternoon preceding his death, C.G. was playing and acting normally until he collapsed in her arms at around 5:00 or 6:00 p.m. It is also inconsistent with her testimony that he had no bruises or scratches on his body. And, notably, as with the previous injury a year earlier when C.G. had suffered another intentional injury, a spiral fracture of the tibia, Ramirez was unable to explain how C.G. was injured. C.G. sustained injuries which resulted in his death; yet, Ramirez could not explain them and, despite knowing C.G. had been under Rodriguez's care, and that he confessed to hurting C.G., was unwilling to place the blame on Rodriguez for C.G.'s death. The medical testimony indicates Rodriguez should have been aware of C.G.'s need for immediate medical attention, yet she did not seek it until he was near death. Even then, she took C.G. to her aunt's house instead of to the hospital. Lastly, according to Ramirez's therapist, if Ramirez was unable to identify the risk factors that resulted in injury and death to C.G., then Ramirez would be unable to make the changes necessary to protect J.C.R. in the future.

We conclude the trial court did not err in ordering termination of Ramirez's parental rights to J.C.R. based on both environmental and conduct endangerment. There is both legally and factually sufficient evidence to support the trial court's findings. Accordingly, we affirm the trial court's termination order.

Karen Angelini, Justice