# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00121-CV

**Mary Ayala, Appellant**

v.

**Texas Department of Family and Protective Services, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT
## NO. D-1-F-07-004538, HONORABLE ORLINDA NARANJO, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Mary Ayala appeals a decree terminating her parental rights. The decree was based on a jury's finding that termination was in her children's best interest. Ayala contends that the evidence was legally and factually insufficient to support a finding that clear and convincing evidence supported termination. She also contends that the trial court erred by refusing to submit jury questions concerning conservatorship. We will affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

At approximately 10 p.m. on July 31, 2007, Austin Police Department officer Evonne McGuire responded to a report of a stabbing at Ayala's home. When Officer McGuire entered the home, she observed that the electricity was off and that the only source of light was an open refrigerator powered via an extension cord running onto a neighbor's property. McGuire made

contact with Lorena Torres, Ayala's sister, who claimed that she had stabbed herself in the thigh.[1]

McGuire then made contact with Ayala, who was in a bedroom with her three children: B.M., who was six years old at the time; I.M., who was nearly five; and A.M., who was approximately three and a half. Ayala was approximately twenty-three years old at the time and was eight months pregnant with her fourth child, J.C.

Ayala told McGuire that she had been at the house all day with her extended family and with her boyfriend, Jorge Centeno Patino, who had fled before McGuire arrived because he had recently been arrested for assaulting Ayala and wanted to avoid another encounter with law enforcement.[2] Because there had been a stabbing in the home and because the utilities were off, Officer McGuire called the Child Protective Services ("CPS") division of the Texas Department of Family and Protective Services ("the Department"). A CPS investigator arrived at the home at approximately 1:45 a.m., at which time she found B.M. sleeping on the floor and I.M. and A.M. sleeping on mattresses on the floor. The investigator inspected the kitchen and found very little food in it. She spoke with Ayala, who told her that the children had been in the living room adjacent to the kitchen when Torres was stabbed. Ayala signed a "safety plan"[3] in which she agreed to (1) have the utilities turned back on the following day, (2) allow no physical violence in her home, and (3) allow no contact between her children and certain of her adult relatives.

---

[1] The initial emergency call to police indicated that Torres had been stabbed by her boyfriend, but Torres and Ayala subsequently claimed that Torres had stabbed herself.

[2] Centeno Patino was, in fact, arrested multiple times for assaulting Ayala.

[3] A "safety plan" is a "checklist used to assess risk and identify actions to increase safety for victims." Website of the Texas Attorney General, http://www.oag.state.tx.us/victims/acp.shtml (last visited Aug. 19, 2010).

Later the same day, a different CPS investigator, Amelia Chavez, visited Ayala's home. Ayala was not there, purportedly because she was out trying to have her utilities turned back on, but her mother, Janie Torres, was. Chavez interviewed Torres, who indicated that her daughter Lorena had stabbed herself the previous night and that Lorena's children had been removed by the Department approximately four or five years earlier because of Lorena's drug use. Chavez also interviewed B.M., who indicated that she was aware of the previous night's violence and stated that she was sad because the lights did not work. Chavez also observed I.M. and A.M., noting that their verbal skills seemed underdeveloped. Before departing, Chavez told Torres that no one else should be allowed in the house before Chavez returned and interviewed Ayala.

Chavez did so on August 3, 2007. After discussing the events of July 31, Ayala agreed to sign a second safety plan that stated her boyfriend and extended family were not allowed in the home. Chavez walked through the home and noticed that it was dirty and infested with cockroaches. She also noticed that the toilets were filled with human waste even though they were not functioning because the water was turned off. Chavez referred Ayala to various non-profit organizations that could assist her with escaping domestic violence and paying her utility bills.

On August 14, 2007, police were again called out to Ayala's home for a domestic-violence dispute. Ayala's boyfriend, Jorge Centeno Patino, alleged that one of Ayala's sisters had thrown a glass at him and attempted to choke him. Ayala and her children were present at the time of the incident. The police made no arrests but indicated in their report that they had been called out to Ayala's home many times.

Later the same day, a CPS investigator went to the home. Ayala was not home, but her mother and children were. Yet another safety plan was put into place, this one apparently signed

3

by Ayala's mother, that again stated no one should be in the home besides Ayala, her mother, and her children.

On August 17, 2007, a CPS caseworker visited the home. Ayala was once again not there, and her mother was at the home caring for the children. The utilities still had not been turned on.

On August 29, 2007, the Department received a referral (the source is not identified in the record) alleging that Mr. Centeno Patino had physically abused Ayala and her children. An employee of Travis County Children's Services visited Ayala's home. Ayala was once again not there; she was at the hospital visiting her son J.C., who had been born prematurely five days earlier.[4] Centeno Patino was apparently at the home, however, in violation of the safety plans that had been put in place. The Children's Services employee who was visiting noticed that Ayala's children had lice. Their lice problem was longstanding, having first come to the Deparment's attention in April of 2007, and was apparently partially responsible for B.M. missing more than 40 days of school that year. The school had supplied Ayala with anti-lice shampoo several times, but the problem kept recurring.

On August 30, 2007, Amelia Chavez returned to Ayala's home. She spoke with Ayala's mother, as Ayala was once again not there. Ayala's mother denied that Centeno Patino had been staying in the home, but B.M. stated that he had been. Chavez observed that the utilities had been restored but the cockroach infestation had not been resolved. She also observed several fist-

---

[4] J.C. required an extended hospital stay after his birth because he was born with a breathing defect.

4

sized holes in the walls. B.M. stated that Centeno Patino had made them, and I.M. demonstrated how by pretending to punch the walls. Chavez observed that A.M.'s scalp was severely infested with lice. She also observed that other than an old car seat, nothing in the house indicated that Ayala had prepared for J.C.'s homecoming from the hospital.

In light of all these issues, the Department filed a petition on September 5, 2007 seeking temporary managing conservatorship of Ayala's children. After a hearing, the district court granted the petition and also ordered Ayala to (1) submit to psychological testing; (2) submit to drug testing; (3) participate in and successfully complete parenting classes and protective parenting classes; (4) participate in and successfully complete individual therapy; and (5) secure and maintain stable housing and employment. The order also appointed CASA (Court Appointed Special Advocates) the children's guardian ad litem and allowed Ayala two hours' supervised visitation per week with the children. The children were placed with foster families.

The court subsequently held permanency hearings in February, June, and October of 2008, *see* Tex. Fam. Code Ann. §§ 263.301-.307 (West Supp. 2009), each time concluding that the Department should remain the children's managing conservator. Ayala eventually requested a jury trial, and one was held between January 26 and February 3, 2009. The evidence introduced at trial is discussed below. At the conclusion of the trial, Ayala asked the court to submit jury questions concerning conservatorship in the event that the jury found her parental rights should not be terminated. The court refused, instead submitting only questions concerning termination, and the jury found that Ayala's relationship with her children should be terminated in the children's best interest. Accordingly, the court issued the termination decree that Ayala now appeals.

## STANDARD OF REVIEW

We review the trial court's submission of jury questions under an abuse-of-discretion standard. *Rosell v. Central W. Motor Stages, Inc.*, 89 S.W.3d 643, 653 (Tex. App.—Dallas 2002, pet. denied). The trial court has broad discretion in submitting jury questions, subject only to the limitation that controlling issues of fact must be submitted to the jury. *Id.* (citing *Wright Way Constr. Co. v. Harlingen Mall Co.*, 799 S.W.2d 415, 422 (Tex. App.—Corpus Christi 1990, writ denied) (op. on reh'g)).

A court may terminate parental rights based on findings by clear and convincing evidence that (1) a parent has committed any of several statutory bases for termination and (2) termination is in the best interest of the child. *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002); *see* Tex. Fam. Code Ann. §§ 161.001-.007 (West 2008 & Supp. 2009); *Holley v. Adams*, 544 S.W.2d 367, 370-72 (Tex. 1976). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2008); *see In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980).

In a legal-sufficiency review of a finding terminating parental rights, an appellate court reviews all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). To give appropriate deference to the fact-finder's conclusions and the role of a court conducting a legal-sufficiency review, a reviewing court must assume that the fact-finder resolved disputed facts in favor of its finding if a reasonable fact-finder

could do so. *Id.* An appellate court disregards all evidence that a reasonable fact-finder could have disbelieved or found to have been incredible. *Id.*

In a factual-sufficiency review of a finding terminating parental rights, the inquiry is whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. *Id.* A court of appeals must give due consideration to evidence that the fact-finder could reasonably have found to be clear and convincing. *Id.* A court of appeals should consider whether disputed evidence is such that a reasonable fact-finder could not have resolved that disputed evidence in favor of its finding. *Id.* If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

## DISCUSSION

### *Submission of Jury Questions Concerning Conservatorship*

In her first issue, Ayala contends that the trial court erred by refusing to submit jury questions concerning conservatorship. She argues that Texas Family Code sections 105.002, 153.005, and 153.372 gave her the right to have the jury consider naming her a conservator in lieu of terminating her parental rights altogether. She also argues that the trial court's error was harmful because "[o]ffering conservatorship to the jury as an alternative to termination would have provided the jury with a less draconian option when deliberating a final verdict."

We disagree. The controlling question in this case was whether Ayala's parental rights should be terminated. *See Texas Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649

7

(Tex. 1990); *In the Interest of J.T.G.*, 121 S.W.3d 117, 129 (Tex. App.—Fort Worth 2003, no pet.) ("In parental termination cases, the controlling question is whether the relationship between the parent and each child should be terminated."). The trial court "asked the controlling question," so it did not abuse its discretion by refusing to submit additional questions. *E.B.*, 802 S.W.2d at 649. We overrule Ayala's first issue.

### *Legal and Factual Sufficiency*

In her second through seventh points of error, Ayala contends that the evidence was legally and factually insufficient to support termination.

Termination of parental rights requires two findings: first, that the parent engaged in one or more statutorily proscribed behaviors, and second, that termination is in the children's best interest. *See* Tex. Fam. Code § 161.001. In this case, the jury found that Ayala satisfied the former requirement two ways: (1) by knowingly placing or allowing her children to remain in conditions or surroundings which endangered their physical or emotional well-being, *id*. § 161.001(1)(D), and (2) by engaging in conduct or knowingly placing the children with persons who engaged in conduct that endangered their physical or emotional well-being, *id*. § 161.001(1)(E). The jury separately found that termination was in the children's best interest. *Id*. § 161.001(2). Our task is to determine whether there was legally and factually sufficient evidence to support these findings.

We hold that there was. On the issue of the children's best interest, the Department presented testimony from the following witnesses:

- William Dubin, a psychologist who evaluated Ayala in September 2007 (shortly after the Department became her children's temporary managing consevator);

8

- Amelia Chavez, a Department investigator;

- Helen Williams, a child and family counselor who worked with Ayala between September 2007 and August 2008;

- Amanda Gerdes, a parent trainer who worked with Ayala from October 2008 until a week before trial;

- Tammy Linseisen, a parenting coach who worked with Ayala and her children between July and September of 2008;

- Jennifer Wertz, a CASA volunteer who worked with Ayala and her children from October 2007 to July of 2008; and

- Lindsay Tubbs, a Department conservatorship worker who was assigned to Ayala's case starting in September 2007.

These witnesses all opined unequivocally that terminating Ayala's parental rights was in the children's best interest.[5] They based their opinions on many factors, including psychological testing of Ayala and her children; observation of Ayala and her children; visits to Ayala's home; Ayala's lack of progress in counseling and parent-education endeavors; Ayala's inability to obtain employment or improve her financial situation; Ayala's lack of a healthy, stable family-support structure; and the children's rapid improvements, both physical and cognitive, once they were placed in foster care.

On the issue of Ayala's involvement in statutorily proscribed behaviors that endangered the children, the Department's witnesses testified to the following:

- B.M. and A.M. had chronic lice problems that Ayala did not remedy despite receiving treatment supplies and guidance;

---

[5] Ryan Miller, a CASA supervisor whom Ayala called as an adverse witness, also opined unequivocally that terminating Ayala's parental rights was in the children's best interest.

- Ayala's home had no utilities for multiple stretches of time, and the toilets were filled with human waste;

- Ayala did not clean her children's clothes regularly;

- Ayala made virtually no preparations for the arrival of J.C., who had health problems that required electricity (to power a breathing machine) and sanitary conditions at home;

- B.M. missed over 40 days of school in the year leading up to her removal;

- Ayala's primary backup caretaker, her mother, had her own history of being reported to the Department for endangering her children;

- Ayala's home was chaotic and dangerous; her boyfriend was arrested multiple times for assaulting her, and the police were called out to the residence regularly;

- Ayala repeatedly violated her safety plans by allowing her boyfriend and extended family into her home;

- Ayala's children were exposed to or witnessed sexual activity between Ayala and her boyfriend, and B.M. acted out sexually while in foster care;

- Ayala did not have steady work and made no earnest efforts to acquire it while the children were in foster care;

- B.M., I.M., and A.M. were all diagnosed with post-traumatic stress disorder and impaired levels of cognitive function; and

- Shortly before trial, Ayala gave birth to a fifth child, further limiting the attention and resources she could devote to her four existing children.

In addition, the professionals and experts called by the Department all agreed that even though Ayala underwent extensive counseling and parental education after her children were taken from her, she lacked the cognitive capacity to change her parenting habits.[6] Thus, there was evidence not only that

---

[6] Dr. Dubin testified that Ayala had mild mental retardation and a personality disorder, both of which were essentially untreatable.

10

Ayala had exposed her children to harm, but also that she was incapable of providing a better environment for them in the future.

Ayala did not present significant evidence to the contrary. While she testified that she loved her children and was determined to provide them a healthier environment, she provided no evidence that she had not actually endangered her children or that she would be able to provide them a better environment in the future.[7] It is not surprising, therefore, that Ayala's appellate brief does not cite the record even once in attempting to argue that termination was improper.

In sum, the Department presented significant evidence to support findings in favor of termination, and Ayala presented little evidence to the contrary. Thus, we hold that the evidence was legally and factually sufficient to support a finding that Ayala's parental rights should be terminated. *In re J.F.C.*, 96 S.W.3d at 266. We overrule Ayala's second through seventh issues.

## CONCLUSION

For the reasons stated above, we affirm the decree terminating Ayala's parental rights.

_____

David Puryear, Justice

Before Justices Patterson, Puryear and Henson

Affirmed

Filed:   September 16, 2010

_____

[7] At the time of trial Ayala had a new apartment, but it was too small (200 square feet) to house five children. She also had no income and no concrete plans as to how she was going to provide and care for her children if they were returned to her.

11