# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-13-00646-CV

**C. L. J. and T. P., Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

### FROM THE DISTRICT COURT OF BELL COUNTY, 146TH JUDICIAL DISTRICT
### NO. 258,562-B, HONORABLE JACK WELDON JONES, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

C., the son of appellants C.L.J. and T.P., was born about four months premature in April 2012. He weighed about one pound and was immediately placed in the neonatal intensive care unit (NICU), where he remained for five months. In July 2012, while C. was still in the hospital, the Texas Department of Family and Protective Services took conservatorship of C. due to allegations of neglect by appellants. After several months, the Department's goal changed from reunification of the family to termination of appellants' parental rights, and in August 2013, a jury trial was held. The jury found that appellants had endangered C., that they had failed to comply with the provisions of a court order setting out actions necessary for them to regain custody, and that termination of appellants' parental rights was in C.'s best interest. *See* Tex. Fam. Code § 161.001(1)(E), (O). On appeal, appellants attack the sufficiency of the evidence supporting both grounds for termination and the finding that termination is in C.'s best interest. Because we agree

that the evidence in this record is insufficient to support the statutory grounds alleged for termination, we reverse the trial court's decree of termination and render judgment in favor of appellants.

## Standard of Review

In a termination case, we ask whether the Department proved, by clear and convincing evidence, that the parents engaged in conduct that amounts to statutory grounds for termination pursuant to section 161.001 and that termination is in the child's best interest. *See id.* § 161.001; *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002). Clear and convincing evidence is a heightened standard of proof that requires "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *see C.H.*, 89 S.W.3d at 25. We first view the evidence in the light most favorable to the jury's verdict, assuming that the jury resolved disputed facts in favor of its finding when reasonable to do so, disregarding evidence when reasonable to do so, and considering undisputed evidence that does not support the jury's findings, and ask whether a reasonable trier of fact could have formed a firm belief or conviction that the Department's allegations were true. *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). If the evidence is legally sufficient, we then view all of the evidence in a neutral light, asking whether the jury could have reasonably formed a firm belief or conviction that the Department's allegations were true. *See id.* We defer to the jury's credibility determinations and reasonable resolution of factual disputes. *See In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

## Summary of the Evidence

The Department alleged and the jury found two statutory grounds for termination—(1)

that appellants had engaged in conduct or knowingly placed C. with people who engaged in conduct

that endangered his physical or emotional well-being and (2) that appellants did not comply with the

provisions of a court order that established actions necessary for them to regain custody of C. The

jury heard the following[1]:

- At the time C. was born, T.P. had already been involved with the Department through a case involving her two older children. In that case, which concluded within days of the Department taking conservatorship over C., T.P. was accused of having neglected her children, who were three and six, by allowing them to remain alone after school and into the evening while she worked. Her then-husband, the older children's father, was stationed overseas at the time, and they were in the process of separating and seeking a divorce.[2]

- C. was born on April 4, 2012, at twenty-eight weeks gestation. He suffered from numerous ailments due to his prematurity and remained in the NICU for five months following his birth. The Department sought conservatorship in late July 2012, based on concerns brought to the Department's attention by Tiffany Hanff, a social worker at the NICU.[3]

---

[1] Due to our determination related to statutory grounds, we need not summarize the evidence that relates solely to the best interest determination. *See* Tex. R. App. P. 47.1 (appellate court opinions should be as "brief as practicable").

[2] In that case, a Department caseworker testified that T.P. complied with "most" of the services but did not: pay child support, although she bought items for the children; answer the caseworker's calls; follow all of the recommendations that resulted from her psychological evaluation; or provide proof of employment, an address, or regular status updates. T.P. insisted that she had complied with the orders and completed all the required services. That case concluded in July 2012 with the children's father being given primary conservatorship and T.P. being named a joint managing conservator with visitation.

[3] At the time C. was born and the Department began to seek custody, Hanff had been employed as a social worker for the hospital for between one and one and one-half years. There was no testimony or evidence provided about her experience, training, or professional credentials.

- Hanff testified that she asks "all our families if there's an open CPS case or any history," and when she learns about an open case, she contacts the Department "to make sure that we were working along with CPS in helping to provide the family with support." Thus, in appellants' case, when T.P. told Hanff about the case involving her older children, Hanff contacted the Department about C. sometime before May 1.

- Hanff testified that in reviewing C.'s NICU visitor log in June 2012, she noticed that appellants "hadn't been there for quite a while—for significant time." She reported her concerns to the Department on June 19 and then called T.P. on June 20 to explain that NICU personnel "needed [appellants] to be here more"; "afterwards [appellants] did increase their visits," usually visiting for "a little bit more than an hour at a time." Hanff said that before her June 20 call, the frequency of appellants' visitation "was concerning. Afterwards they did increase their visits . . . [a]nd it was not." Hanff also testified that she called the Department after June 20 to tell them that appellants were visiting more but could not remember the Department's "exact response."

- Hanff testified that the hospital did not have a "minimum standard for parents to visit" a premature infant in the NICU. When asked how often "most parents visit," Hanff answered, "It's a hard one to really answer. It depends on situations. But for the most part I would say families visit on a pretty regular basis depending on what their situation is." On the rare occasion that the hospital feels a family is not visiting enough, "We try to just get families to increase the time on their own before having to be more strict and actually giving them specific times to be there."

- Hanff testified about the NICU's visitor log in general and said a family "should" sign in when visiting and that the hospital sometimes had to repeatedly ask families to comply with that request. When a mother is still a patient in the hospital following a child's birth, however, she is not required to walk to the other end of the NICU to sign in and out, and the hospital "usually tr[ies] to have the father . . . go in and sign the family in and out."

- According to Department calculations, C.'s log indicated that T.P. visited C. for a total of slightly over thirty-two hours in the three months after he was born,[4] including the week T.P. remained as a patient in the hospital following C.'s birth, and T.P. was asked whether she thought that was sufficient. She replied that, considering the requirements placed on her by the Department in the case involving her older children, "I think I did good that I saw him almost every day, whether it was 10 minutes or an hour or 45 minutes or a half an hour." She said, "I was working 10 hours a day and so I visited whenever I could." T.P. also said

---

[4] Hanff testified that part of C.'s log was missing, and the log itself appears to show at least one large gap, from mid-April until mid-May 2012. It appears that the Department's calculation of thirty-two hours is based on the incomplete log.

4

that after her release from the hospital, she visited C. "almost every day" but was sometimes turned away or had her visits cut short because C. needed medical treatment.

- Appellants both disputed the evidence that they did not visit C. frequently or for long periods of time. T.P. testified that she visited daily while she was in the hospital for a week after C.'s birth and that she did not have to sign in while she was a patient in the hospital. She also said the brief intervals between "time in" and "time out" were when she left "to get something to eat or just go outside and get some fresh air." T.P. testified that when she asked about signing in or out when she had to leave for a meal or some air, "[T]hey said, 'Just sign out on the time in slot. It's no big deal.'" She also said that "[t]he people there made it like it was no big deal if we missed a sign-in, if we didn't miss a sign-in. And, you know, who was to know that this would be brought up in court later on?"

- T.P. said she did not know exactly what C.'s medical situation was because she had "been told so many different things from the Department and the actual doctors" and because C. was developing much faster and better than doctors had initially predicted. Asked whether he believed C. had cerebral palsy, C.L.J. answered, "I believe that you guys want me to believe that he is so sick that we won't be able to take care of him. I believe that you guys want us to believe that he will never be able to be healthy." Appellants said they would take C. to every doctor's appointment and comply with treatment recommendations. According to C.'s foster mother and the Department's caseworkers, at the time of trial, C. was "a little bit delayed" but had improved and developed well. C. regularly attended physical and occupational therapy and also had a speech therapist, developmental pediatrician, gastroenterologist, and pulmonologist. C. has been with foster families since his release from the hospital into the Department's conservatorship.

- At the time C. was born, appellants were planning to move to Austin and had begun the process of moving. After C.'s birth, they instead remained in Temple in temporary housing, taking temporary jobs so they could be near C. After C.'s release from the hospital into the Department's custody, appellants moved to Austin as they had planned and took up employment here. They lived in a two-bedroom apartment for a while, but shortly before trial moved to a house in a better school district, and they had a crib, car seat, and other equipment to care for C. if he was returned to their care.

- Dr. James Shinder did T.P.'s psychological evaluation in the case involving her older children and found she had a slightly elevated level of anxiety; was somewhat depressed, antisocial, and rebellious; and demonstrated "questionable problem-solving skills." He acknowledged that some of her issues could be related to having her older children temporarily removed.

- Dr. William Dubin performed psychological evaluations on appellants in this case. He said T.P. struggled with depression and stress and "was not honest and straightforward" in her

5

responses. Dubin thought T.P. had "low self-efficacy" in terms of child care and might lack the confidence or ability to parent properly. Dubin said C.L.J. was self-focused, had trouble with comprehension, and might have trouble acting to protect C.'s best interest.

- Dr. Shinder testified that a premature baby needs significant physical contact in order to bond with his parents and that studies had indicated that increased physical contact, particularly with a familiar person, was tied to better recovery in premature infants. Dr. Dubin was concerned about whether C. had bonded with T.P. and C.L.J. and said there were indications that T.P. did not have a sense of emotional closeness to C. and might have trouble observing and understanding C.'s feelings.

- Appellants were ordered to submit for weekly drug testing. They tested positive for marihuana use twice during the pendency of the case: once in early August 2012, about a week after the Department filed its first petition and before any temporary orders were in place, and once in November 2012, after "being told that the Department never planned on returning our son." In the time frame between November 2012 and January 2013, appellants missed five or six tests and provided diluted samples for three or four tests, explaining that they were fasting and praying at the time. All the tests taken after January were negative.

## Discussion

The Department alleged and the jury found two statutory grounds for termination. First, the Department alleged that appellants had endangered C. by their own conduct or by leaving him in the care of someone who endangered him. *See* Tex. Fam. Code § 161.001(1)(E). However, the record lacks any evidence to support a finding of endangerment.

A child is "endangered" if he is exposed to loss or injury of if his emotional or physical health is jeopardized. *A.S. v. Texas Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 711 (Tex. App.—El Paso 2012, no pet.). Endangerment requires more than the threat of a "'metaphysical injury or the possible ill effects of a less-than-ideal family environment,'" but "[i]t is not necessary that the conduct be directed at the child or that the child suffers injury, or even that the conduct constitutes a concrete threat of injury to the child." *Id.* at 712 (quoting *Texas Dep't of*

6

*Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). Under subsection (E), our inquiry is whether there is evidence that the endangerment of the child's well-being was a direct result of the parent's conduct. *Id.* Termination under subsection 161.001(1)(E) requires "more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required." *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). The Department need not prove that the parent's conduct was directed at the child or that the child actually suffered injury, and we consider parental conduct both before and after the child's birth. *Id.*

This endangerment inquiry is unique because during the entire time in question, C. was in the NICU of a reputable hospital, from the time he was born until his release into the Department's custody. There is no indication that any conduct by appellants caused C.'s premature birth, and all of the evidence was that C. was well cared for while in the NICU and that his condition improved during his time there. Nor was there evidence of some objective, reliable standard related to NICU visitation that could lead a reasonable person to believe that appellants' rate of visitation before Hanff's June 19 report to the Department endangered C. Even when we consider the testimony about appellants' marihuana use during this case or the fact that the Department was involved with T.P. with respect to her older children (a case that closed within days of the Department seeking conservatorship over C. with T.P. being granted joint managing conservatorship and visitation rights[5]), the record does not support a finding by clear and convincing evidence that appellants posed a risk of endangerment to C. either by their own conduct or by C.'s placement in the NICU

---

[5] T.P.'s ex-husband testified on her behalf and said she was a "good mom" and that it would not be in their children's best interest to be kept away from their mother.

from the time of his birth until the Department filed its petition.. The evidence here is legally insufficient to support termination based on endangerment. *See A.S.*, 394 S.W.3d at 711-12.

The other ground relied upon for termination of parental rights was that T.P. and C.L.J. failed to comply with a court order that specifically established a series of actions necessary to regain custody of C. after his removal "under Chapter 262 for the abuse or neglect of the child." Tex. Fam. Code § 161.001(1)(O). However, there is insufficient evidence to show that C. was removed as a result of neglect.[6] *See id.*

Under chapter 262, the Department's petition for removal must show a trial court that there is "an immediate danger to the physical health or safety of the child or [that] the child has been a victim of neglect or sexual abuse." *Id.* § 262.101(1). The trial court may consider whether a parent has "abused or neglected another child in a manner that caused serious injury to or the death of the other child." *Id.* § 262.102(b)(1). The supreme court has held that neglect may include the risk of neglect, noting that "danger to the child's physical health or safety" includes "'exposure of the child to loss or injury that jeopardizes the physical health or safety of the child without regard to whether there has been an actual prior injury to the child.'" *In re E.C.R.*, 402 S.W.3d 239, 246-47 (Tex. 2013) (quoting Tex. Fam. Code § 101.009).[7] The Texas Supreme Court in *E.C.R.* concluded:

---

[6] There is no evidence to show any abuse, thus neglect is the only possible ground on which the Department can rely.

[7] In *In re E.C.R.*, the supreme court referred to section 261.001's definition of neglect, 402 S.W.3d 239, 246 (Tex. 2013), which is as follows:

(A) the leaving of a child in a situation where the child would be exposed to a substantial risk of physical or mental harm, without arranging for necessary care for the child, and the demonstration of an intent not to return by a parent, guardian, or managing or possessory conservator of the child;

So while subsection O requires removal under chapter 262 for abuse or neglect, those words are used broadly. Consistent with chapter 262's removal standards, "abuse or neglect of the child" necessarily includes the risks or threats of the environment in which the child is placed. Part of that calculus includes the harm suffered or the danger faced by other children under the parent's care. If a parent has neglected, sexually abused, or otherwise endangered her child's physical health or safety, such that initial and continued removal are appropriate, the child has been "remov[ed] from the parent under Chapter 262 for the abuse or neglect of the child."

*Id.* at 248 (quoting Tex. Fam. Code § 161.001(1)(O)). Thus, we are to consider "neglect" as used in section 161.001(1)(O) in a broad sense, which may encompass the risk of future neglect, and ask

---

(B) the following acts or omissions by a person:

(i) placing a child in or failing to remove a child from a situation that a reasonable person would realize requires judgment or actions beyond the child's level of maturity, physical condition, or mental abilities and that results in bodily injury or a substantial risk of immediate harm to the child;

(ii) failing to seek, obtain, or follow through with medical care for a child, with the failure resulting in or presenting a substantial risk of death, disfigurement, or bodily injury or with the failure resulting in an observable and material impairment to the growth, development, or functioning of the child;

(iii) the failure to provide a child with food, clothing, or shelter necessary to sustain the life or health of the child, excluding failure caused primarily by financial inability unless relief services had been offered and refused;

(iv) placing a child in or failing to remove the child from a situation in which the child would be exposed to a substantial risk of sexual conduct harmful to the child; or

(v) placing a child in or failing to remove the child from a situation in which the child would be exposed to acts or omissions that constitute abuse under Subdivision (1)(E), (F), (G), (H), or (K) committed against another child; or

(C) the failure by the person responsible for a child's care, custody, or welfare to permit the child to return to the child's home without arranging for the necessary care for the child after the child has been absent from the home for any reason, including having been in residential placement or having run away.

Tex. Fam. Code § 261.001(4).

9

whether a person of reasonable prudence could have found that C. faced an immediate danger to his health or safety. *See id.*[8] That a child was removed for abuse or neglect "is an element of subsection 161.001(1)(O)," and the Department bears the burden of establishing all elements of its case by clear and convincing evidence. *See In re J.S.G.*, No. 14-08-00754-CV, 2009 Tex. App. LEXIS 3224, at *15-17 (Tex. App.—Houston [14th Dist.] May 7, 2009, no pet.) (mem. op.) ("we reject the Department's argument and conclude that 'removal as a result of abuse or neglect' is an element of subsection 161.001(1)(O)"; courts must determine whether Department proved by clear and convincing evidence that child was "removed under chapter 262 as a result of abuse or neglect").

C. was safely in the hospital from the time of his birth to the time the Department took custody of him on July 26, 2012, and he was released directly into the Department's care and was never in appellants' custody. The Department presented little evidence about its initial decision to seek conservatorship—none of its investigators testified; its conservator caseworkers made only vague reference to the investigation that led to C.'s removal; and the progress reports admitted into evidence state only that the Department became involved due to Hanff's June 19 report that "[T.P.] has not been visiting the hospital," that hospital staff "had to tell [T.P.] that she needed to visit her son more, as she was only coming to the hospital for ten to fifteen minutes at a time," and that after that discussion, T.P. "started to visit for the minimum allowed time." Hanff testified that she

---

[8] In *E.C.R.*, there was evidence of serious abuse and neglect of two older children, including testimony that the mother had punched one child and dragged her by her hair, and that when the mother was incarcerated, she left the subject child with an abusive boyfriend who had an extensive criminal history. 402 S.W.3d at 248. Thus, the court concluded, a person of ordinary prudence could have found that the child faced an immediate danger to his physical health or safety sufficient to establish removal for abuse or neglect. *Id.*

informed the Department of her concerns on June 19, and that on June 20, one day later, she called appellants to talk about the problem. Appellants then "definitely increased" their visits to a degree that Hanff was no longer concerned.[9] Hanff also testified that she informed the Department that appellants had increased their visitation of C. and that the hospital did not have any definitive minimum of visitation time or frequency required when a child was in the NICU.

The Department was required to prove by clear and convincing evidence that C. was removed from appellants' care due to neglect, and that element is not supported by the evidence. *See id.* We therefore hold that the Department did not establish the statutory grounds it relied upon for terminating appellants' parental rights. Having so held, we do not consider whether the evidence also supported a finding that termination was in C.'s best interest.

We pause to reiterate the well-known principle that parental rights are of constitutional magnitude and "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982). In light of that important dictate, we have grave concerns that the Department appears to have decided that the mere fact that appellants initially did not visit C. in the NICU with a frequency satisfactory to the hospital social worker, Hanff, somehow rose to the level of neglect or placing C. at risk of physical or emotional harm and to such a degree that it warranted the Department seeking conservatorship before C. was ever released from the hospital, particularly considering Hanff's testimony that the parents increased the frequency of their visitation when a concern was expressed. The Department presented scant evidence to the jury about why it removed

---

[9] We note that appellants strongly disputed the accuracy of the NICU log and that at least one month is missing, but even if those issues are disregarded, Hanff's testimony on its own shows that appellants increased their visitations to a point that the hospital no longer had concerns about their adequacy.

11

C. from appellants' conservatorship to begin with, but it appears that the Department rushed to remove C. largely because of the case involving T.P.'s older children, a case that was closed just days after the Department took custody of C., with the children being placed with their father and T.P. being named joint managing conservator with visitation rights, and either purposefully ignored appellants' increased visitations or failed to investigate whether their visitations had increased.

We acknowledge that an infant needs physical contact to thrive and bond with his parents, but this is not a situation where the parents abandoned the child for any measurable amount of time. This record is devoid of medical or scientific evidence about minimum or even suggested visitation requirements, and Hanff acknowledged that the hospital did not have standards for parental visits. Nor is there evidence that appellants' conduct from C.'s birth until the Department's decision to seek conservatorship approached an objective standard of endangerment or neglect upon which a reasonably prudent person could rely. All we have is Hanff's apparently subjective concerns about appellants' level of parental contact during the first two and one-half months of C.'s life, concerns that appellants alleviated by increasing their visits as soon as Hanff brought the issue to their attention. Then, despite appellants changing their behavior to a point that Hanff no longer had concerns, *well before the Department even filed its petition*, the Department concluded without reference to discernable guiding standards not only that C. was somehow actively endangered or neglected, but that he was endangered or neglected to such a degree that his removal from his parents' custody was warranted.

**Conclusion**

This record lacks evidence that appellants abused C. Further, the evidence is legally insufficient to show that they endangered C. or that C. was properly removed as a result of parental

12

neglect. We reverse the trial court's decree of termination and render judgment that the evidence is insufficient to support the termination of appellants' parental rights.

_____

David Puryear, Justice

Before Justices Puryear, Rose and Goodwin

Reversed and Rendered

Filed: March 20, 2014