

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00021-CV

_____

IN THE INTEREST OF C.L.-F., A CHILD

---

On Appeal from the 360th District Court
Tarrant County, Texas
Trial Court No. 360-654130-19

---

Before Birdwell, Bassel, and Wallach, JJ.
Memorandum Opinion by Justice Wallach

## MEMORANDUM OPINION

Appellant A.F. (Mother) appeals from the trial court's order terminating her parental rights to her son, C.L.-F. (Caleb),[1] in the proceeding brought by Appellee the Department of Family and Protective Services (the Department). In five issues, she challenges the factual sufficiency of the evidence supporting each statutory ground on which the trial court terminated her rights and the evidence supporting the trial court's finding that termination was in Caleb's best interest. Because we hold that the evidence was factually sufficient to support the order, we affirm.

## Background

Because Mother challenges the evidentiary sufficiency of the trial court's order, we discuss the facts more fully in the analysis of Mother's issues and provide here only a brief summary. The Department filed its petition for protection of a child, for conservatorship, and for termination in a suit affecting the parent–child relationship and sought to immediately remove Caleb from Mother's home based on allegations that Mother had been using K2, a synthetic cannabinoid.[2] Mother initially denied any drug use, but she agreed to a drug test, which was positive for methamphetamine and

---

[1]To protect the privacy of Mother's children and the parties, we use initials and pseudonyms for their names. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b).

[2]K2 has a hallucinogenic effect. *See In re U.L.*, No. 02-21-00218-CV, 2021 WL 5227087, at *2 n.6 (Tex. App.—Fort Worth Nov. 10, 2021, pet. denied) (mem. op.).

amphetamine. The trial court signed an order naming the Department as temporary managing conservator. The Department created a service plan for Mother that had as her goals that she "address her drug use, identify her triggers[,] and develop healthy coping skills" and "have a back[-]up plan in order to ensure [Caleb] is appropriately cared for should she relapse."

The Department presented three witnesses at trial: Mother; Junia De Pina, the caseworker who conducted the initial investigation; and Stacie Thomas, Mother's current caseworker. The testimony at trial established that during the case's pendency, Mother had completed several drug treatment programs but had repeatedly relapsed. At the conclusion of the trial, the trial court terminated Mother's parental rights. The trial court's termination order found that termination was justified on the grounds contained in Texas Family Code Section 161.001(b)(1)(D), (E), (O), and (P) and that termination was in Caleb's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1), (b)(2).

### Standard of Review & Statutory Termination Grounds

For a trial court to terminate a parent–child relationship, the party seeking termination (here, the Department) must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Texas Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. *Id.* § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction

as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545.

In reviewing a challenge to the factual sufficiency of the evidence supporting termination, we must decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved the specific termination grounds and that termination was in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). We perform "an exacting review of the entire record with a healthy regard for the constitutional interests at stake." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). We give due deference to the factfinder's findings and do not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

## Discussion

### I. The Subsection (E) ground

Because it is dispositive of her issues challenging the termination grounds, we begin with Mother's second issue challenging the factual sufficiency of the evidence supporting the termination ground in Section 161.001(b)(1)(E). Subsection (E) focuses on the parent's behavior and permits termination when the parent has engaged in conduct that endangers the child's physical or emotional well-being. Tex. Fam. Code Ann. § 161.001(b)(1)(E). Mother argues that "the Department presented little to no evidence to support that [she] had engaged in a course of conduct that endangered [Caleb's] physical health or emotional well-being." We disagree; as we will discuss, the

4

Department presented evidence of Mother's continued drug use before and during the case, and that evidence was sufficient to show that Mother had endangered Caleb.

## A.  Termination under Subsection (E)

Under Subsection (E), the relevant inquiry is "whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act." *In re M.B.*, No. 02-15-00128-CV, 2015 WL 4380868, at *12 (Tex. App.—Fort Worth July 16, 2015, no pet.) (mem. op.). "Endanger" in this context means "to expose to loss or injury, to jeopardize." *Id.* (citing *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987), and *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.)). Termination under Subsection (E) requires a voluntary, deliberate, and conscious course of conduct by the parent. *J.T.G.*, 121 S.W.3d at 125. However, the parent's conduct need not be directed at the child or actually cause the child injury; "[t]he specific danger to the child's well-being may be inferred from parental misconduct standing alone." *M.B.*, 2015 WL 4380868, at *12. Courts may consider a parent's conduct that occurred outside the child's presence or after the child's removal by the Department. *In re M.S.*, No. 02-20-00147-CV, 2020 WL 6066400, at *4 (Tex. App.—Fort Worth Oct. 15, 2020, no pet.) (mem. op.); *In re R.S.*, No. 02-15-00137-CV, 2015 WL 5770530, at *6 (Tex. App.—Fort Worth Oct. 1, 2015, no pet.) (mem. op.). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *M.B.*, 2015 WL 4380868, at *12.

An endangerment finding based on evidence that a parent has used an illegal substance is not automatic. *In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied). However, a parent's illegal drug use "exposes the child to the possibility that the parent may be impaired or imprisoned." *See In re E.R.W.*, 528 S.W.3d 251, 264 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (cleaned up). Further, "illegal drug use after a child's removal or during the pendency of a termination proceeding is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct under [S]ubsection (E)." *C.V.L.*, 591 S.W.3d at 751; *see In re J.A.G.*, No. 02-10-00002-CV, 2010 WL 4539442, at *1 (Tex. App.—Fort Worth Nov. 10, 2010, no pet.) (mem. op.) ("A parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, supports a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being." (quoting *In re J.W.*, No. 02-08-00211-CV, 2009 WL 806865, at *4 (Tex. App.—Fort Worth Mar. 26, 2009, no pet.) (mem. op.))).

## B. The evidence relevant to Subsection (E)

### 1. Mother's drug use leads to the Department's involvement.

Of Mother's three children other than Caleb, two have died tragically, and the other does not live with Mother. Mother had a daughter, Caycee, who died by drowning in March 2003. Mother testified at trial that she and Caycee had been taking a nap with the screened window open and, unbeknownst to Mother, Caycee had awakened, gone out the window, and fallen into the pool. Mother has another daughter, Courtney, who

6

was removed by the Department in 2008 due to Mother's drug use. Courtney now lives with Mother's mother. After that, in 2016, Mother's son Cameron died from cancer.

Caleb was born in January 2018. Before his birth, she had been enrolled in a program at Parkland Hospital for "moms-to-be" who needed help "com[ing] off of pain pills slash heroin in a blind-cascading scale." She went from Parkland to a drug treatment program at a facility called Nexus; she was still in that program when Caleb was born. Caleb was born addicted to methadone.

The Department's investigator, Junia De Pina, testified that the Department became involved with Caleb due to concerns that Mother was using K2 around him. De Pina testified that at the time, Mother denied using drugs other than the methadone for which she had a prescription, but she submitted to drug testing, which was positive for methamphetamine and amphetamine. Mother blamed the positive result on diet pills that a friend had given her.

## 2. Caleb is removed, and Mother enrolls in a substance abuse program.

Based on Mother's drug test, the investigator began taking steps to remove Caleb in July 2020. She attempted to find a placement through Mother but could not find a suitable person willing to take Caleb. As a result, the investigator informed Mother that she would be seeking court permission to remove Caleb and that, if the Department were granted that permission, she would return the next day. The trial court signed the order making the Department Caleb's temporary managing conservator, and as promised, the investigator returned to Mother's home the next day and was told to wait

7

in the living room by Mother's friend who had answered the door. After about ten minutes, the investigator asked the friend what was taking so long, and the friend directed her to Mother's room, where the investigator found her leaning against the closet. Mother "seemed like she was frozen in time." The investigator explained to Mother that she was there to remove Caleb, and she asked Mother for help putting together a bag for him. Mother did not, however, seem able to understand what was happening. The investigator explained,

> I kept talking to her. She kept looking at me, but it was as if I wasn't there. I realized early on that her pupils were dilated. She was noncommunicative. . . . [E]ventually, I decided to start packing up his bag, which took me around 30 minutes because I couldn't figure it out. . . .
>
> But during that time she never came to me, never moved out of the bedroom. As I was leaving . . . she basically crawled up to [Caleb] and asked to say goodbye, in a way, so—she was not able to actually—she wasn't aware of what was going on the whole time.

Within an hour of the investigator's leaving with Caleb, Mother called her to ask what had happened. The investigator testified, "I explained that at th[at] moment she was still not in the best head space. That I did remove her child[ and that] I [had] presented her with papers. I left [the papers] on her countertop. I [had] asked her to put together clothes [for Caleb]." According to the investigator, Mother responded, "'No, that did not happen.'"

At trial, Mother's testimony was unclear about her K2 use before and around the time of Caleb's removal. She first acknowledged that she was using K2 when the Department became involved with Caleb. She also stated, "[T]hat day I had my best

8

friend in the apartment taking care of him while I went into my bedroom and shut the door and smoked" K2. She later testified, however, that she was not using drugs when he was removed, but she acknowledged that she had used drugs at some point in the three months before Caleb was removed. She testified she had used only K2, but she gave no explanation for her positive drug test for methamphetamine.

In August 2020, Mother again completed a treatment program at Nexus. While there, Mother completed the parenting class that was part of her service plan. Mother did well for a while, and so in January 2021, the Department began a stairstep change in visitation, starting with supervised visits in Mother's home and progressing to unsupervised visits for the day and then to unsupervised overnight visits.

**3. Mother relapses again and goes back to Nexus.**

The parties agree that Mother began again using K2 in the first few months of 2021, but they disagree about exactly when that occurred. The current caseworker, Stacie Thomas, took over the case in February 2021, and she visited Mother at Mother's home in early March 2021. Caleb was with Mother at the time for an unsupervised visit. Thomas went to Mother's house that day because she had received reports that Mother had been showing signs of being under the influence, so she had not told Mother about the visit ahead of time. Thomas testified that during the visit, Mother was "shaking significantly" and "frozen." Thomas said that Mother dropped several items and had a delayed response when spoken to; "[i]t just seemed like she was not even in her body." However, Thomas did not immediately remove Caleb because, even though Mother

"was frozen and shaking, she was still very attentive to [Caleb]." Thomas did, however, speak to her supervisor about the situation, and the two made a plan for the supervisor to visit Mother unannounced the next day.

When the supervisor visited the next day as planned, the supervisor observed Mother shaking and drooling. According to Thomas, the supervisor reported that Mother "had drooled all the way to where the drool was touching the floor." Thomas had a Facetime call with Mother the next weekend, and during the call Mother again appeared "completely frozen" in time. According to Thomas, "[Mother's] mouth was open. She was staring off. She was shaking. There was no response at all."

Mother admitted at trial that she relapsed in March, but she said she did so after the caseworkers' visits. At the time, Mother blamed her drooling on missing some teeth, the shaking on a genetic disorder, and the delayed response to a side effect of her prescribed methadone. Thomas testified that she was not sure if the methadone could have that effect, so she consulted a substance-use professional who told her that methadone produced none of the symptoms displayed by Mother. Thomas set up a urinalysis and nail bed drug test for Mother, who missed the initial test appointment but subsequently took the tests, which were negative. Mother had another negative test on April 22, again after missing her initially-scheduled April 21 test. On April 21, Thomas received a report that Mother had asked to use somebody else's urine for the test. Despite the negative tests, Mother confessed to using K2. According to Thomas,

Mother told her that the symptoms she had displayed during the March visits were "an excuse for her using," and she admitted to a relapse.

Mother acknowledged at trial that the anniversary of her daughter's death in March had in the past been a trigger for her substance use, but she denied that her symptoms were drug-related. In May 2021, Mother returned to Nexus, and the Department requested and received an extension of the case's deadline. The Department sought the extension because Caleb could not be returned to Mother due to her admitted drug use and noncompliance with several drug tests at that time, but the Department was "so close to ending the monitored return[ that] [the Department] wanted to give [Mother] more time to get sober." Mother completed the Nexus program and then began outpatient treatment through MHMR.

### 4. Mother relapses again and completes another treatment program before the December trial.

Mother finished her program at Nexus in June 2021. In July 2021, Mother had a negative drug test. In August, however, Mother began using K2 again. She returned to Nexus in September. This time she was not permitted to complete the program because she had taken with her some antianxiety medication for which she had a prescription but which she failed to report to Nexus staff. She, was, however, able to complete a shorter, more intensive treatment program at Pine Street, another treatment facility. She was successfully discharged from Pine Street in November 2021.

11

The termination trial was held on December 8, 2021. Mother testified that she has been sober since she her release from Pine Street. She stated that she had a nice apartment for which she receives housing assistance. She was not employed but was filing for Social Security disability. She was seeing a mental health counselor once a week and attending NA meetings, and, just days before trial, her doctor had agreed to let her start "a cascading discharge off of methadone." However, she had no plan for caring for Caleb if she had a relapse. Instead, she stated that she would continue with her therapy and NA meetings and that she would not relapse again: "I don't have an answer for you because I don't plan to relapse. Relapse is not a part of my recovery anymore." Asked what was different this time, Mother testified that she had learned her triggers, "how to keep [herself] from falling back into that trap," and she stated, "I've got a sponsor now." She acknowledged, however, that she had a sponsor before.

Thomas, however, expressed her opinion that termination was in Caleb's best interest. Thomas was concerned that Mother had no plan for how to safely care for Caleb if she had a relapse. She stated that Mother had been provided services over the course of the case in an effort to reunify her and Caleb but that Mother had continuously struggled to maintain her sobriety throughout that period, despite multiple admissions to substance abuse treatment programs. She stated that she believed that if Caleb were returned to Mother, "he would be left unsupervised while [Mother] was under the influence." She was concerned that "nothing had changed" since De Pina had observed Mother under the influence at Caleb's removal.

Thomas testified that if the trial court granted termination, the plan was for Caleb to be adopted by his foster parents. She believed termination was in Caleb's best interest because Caleb had been in care "for approximately 17 months now due to his mother's continued use of illegal substances and inability to provide him with adequate supervision."

## C. Conclusion

Mother asserts that the evidence shows that she had been seeking treatment for methadone use and successfully completed an intensive treatment program, that she tested negative for all drugs in November 2021 except for the methadone for which she had a prescription, and that by the time of trial she "had rectified the concerns that brought [Caleb] into care and was able to provide an environment [that] would support his physical and emotional well-being."

Mother's continued attempts to achieve and maintain sobriety and the fact that she appeared attentive to Caleb in Thomas's visit to Mother's home are some evidence that Mother was attempting to comply with her service plan and become a suitable parent for Caleb. However, the trial court was not required to believe Mother's contention that this time, things would be different. *See A. C. v. Tex. Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 705–06 (Tex. App.—Austin 2019, pet. denied). During this case alone, Mother relapsed multiple times after completing substance abuse treatment programs. By her own admission, Mother continued to use drugs after Caleb's removal, which is conduct that jeopardized her parental rights and supports an

13

endangerment finding. *See J.A.G.*, 2010 WL 4539442, at *1. Further, the trial court had evidence from which it could reasonably believe that Mother was impaired by drugs while she was caring for Caleb on days that he had been returned to her for unsupervised visitation, which is also evidence of endangerment. *See E.R.W.*, 528 S.W.3d at 264. Based on our review of the record, the trial court could reasonably form a firm conviction or belief that the Department proved endangerment under Subsection (E). We overrule Mother's second issue. We therefore do not reach Mother's first, third, or fourth issues challenging the other termination grounds. *See* Tex. R. App. P. 47.1.

## II. Best Interest

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013); *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

(A) the [child's] desires . . . ;

(B) the [child's] emotional and physical needs[,] . . . now and in the future;

(C) the emotional and physical danger to the child now and in the future;

14

(D) the parental abilities of the individuals seeking custody;

(E) the programs available to assist these individuals to promote the [child's] best interest . . . ;

(F) the plans for the child by these individuals or[, if applicable,] by the agency seeking custody;

(G) the stability of the home or proposed placement;

(H) the [parent's] acts or omissions . . . indicat[ing] that the existing parent–child relationship is not a proper one; and

(I) any excuse for the [parent's] acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012).

These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* Additionally, Family Code Section 263.307 lists factors that "should be considered by the court and the [D]epartment in determining whether the child's parents are willing and able to provide the child with a safe environment." Tex. Fam. Code Ann. § 263.307(b). In considering those factors, "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." *Id.* § 263.307(a).

In Mother's favor, the trial court had evidence of Mother's willingness to seek out, accept, and complete counseling services and to cooperate with and facilitate the Department's close supervision. *See id.* § 263.307(b)(10). On the other hand, the trial court had evidence that during the course of the proceedings, despite Mother's willingness to accept help and her completing substance abuse treatment multiple times, Mother was never able to successfully maintain her sobriety. The trial could have thus inferred that Mother's drug abuse would recur if Caleb were returned to her. *See In re E.C.*, No. 02-20-00022-CV, 2020 WL 2071755, at *9 (Tex. App.—Fort Worth Apr. 30, 2020, no pet.) (mem. op); *A.S. v. Tex. Dep't of Fam. & Protective Servs.*, 394 S.W.3d 703, 714 (Tex. App.—El Paso 2012, no pet.). The trial court also had evidence from which it could find that, on multiple occasions, Mother's drug usage left her impaired while caring for Caleb. *See* Tex. Fam. Code Ann. § 263.307(b)(8); *Holley*, 544 S.W.2d at 371–72. By the time of trial, Caleb was almost four years old and had been in care for seventeen months. Thomas testified that Caleb's foster family is willing to adopt Caleb and that he is doing well with that family. Based on our review of the record, the trial court could reasonably form a firm conviction or belief that the Department proved that termination was in Caleb's best interest. We overrule Mother's fifth issue.

## Conclusion

Having overruled Mother's second and fifth issues, we affirm the trial court's termination order.

16

/s/ Mike Wallach

Mike Wallach

Justice

Delivered: June 30, 2022